# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3989

WEI YE, HAO WANG, DOES,
A, B, C, D, E, F, and others similarly
situated,

*Plaintiffs-Appellants*,

*v.*

JIANG ZEMIN and FALUN GONG
CONTROL OFFICE, a/k/a OFFICE 610,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 7530—**Matthew F. Kennelly**, *Judge.*

_____

ARGUED MAY 27, 2004—DECIDED SEPTEMBER 8, 2004

_____

Before BAUER, MANION and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* The appellants are practitioners of Falun Gong, a spiritual movement of Chinese origin. Most of the appellants are current or past residents of the People's Republic of China. In addition, two of the appellants are United States citizens and a third is an alien resident of Illinois. The appellants appeal from a decision of the United States District Court for the Northern District of Illinois dismissing their lawsuit against the former President of China, Jiang Zemin, and an office of the Chinese Communist

Party (the "Party") allegedly established by Jiang for the purpose of suppressing Falun Gong. We affirm.

## I.

Jiang Zemin served as President of China for approximately ten years, from March 1993 to March 15, 2003. During part of his tenure as President, he also served as the Secretary General of the Central Committee of the Chinese Communist Party (the head of the Party). President Jiang stepped down as head of the Party on November 15, 2002.

Beginning in 1999, the Chinese government and the Party took steps to crack down on Falun Gong.[1] Falun Gong, formed in 1992 by a former Chinese soldier, Li Hongzhi, "combin[es] traditional Buddhist teachings and predictions about the end of the world with meditation and martial arts discipline as a prescription for physical and spiritual well-being. Falun Gong teaches that illness stems from evil and that by following the principles of 'truth, compassion and forbearance,' one can attain clairvoyance and other preternatural faculties."[2] The Chinese government and the Party see things differently. They have denounced the movement as a cult and have accused it of seeking to subvert or

---

[1] We accept, for present purposes, as true the appellants' allegations. We further note that the United States intervened below only to assert President Jiang's immunity and has not taken issue with the veracity of the claims of the appellants. In its brief to this court, the United States draws our attention to remarks of President George W. Bush and State Department Reports condemning the types of practices alleged by the appellants.

[2] John Pomfret and Michael Laris, "China Outlaws Nonconformist Spiritual Sect; Group Had Organized Protests Across Nation," *Wash. Post*, July 23, 1999, at A1.

overthrow the government and the Party's grip on power.[3] According to at least one news report, President Jiang himself declared that suppressing Falun Gong was one of the " 'three major political struggles' of 1999."[4]

To that end, on June 10, 1999, President Jiang established, as part of the Party's apparatus, the Falun Gong Control Office. The Office is known as "Office 6/10" after the date of its creation. In July 1999, President Jiang issued an edict outlawing Falun Gong. This edict was followed by mass arrests, allegedly farcical trials, torture, forced labor, "re-education," and the killing of members.

The appellants filed this lawsuit against President Jiang and Office 6/10 on October 18, 2002. The appellants' complaint, recites, *inter alia*, claims of torture, genocide, arbitrary arrest and imprisonment, as well as other claims related to the appellants' freedom of conscience, movement, and religion. The appellants argued that the district court had jurisdiction to hear their case pursuant to the Alien Tort Claim Act, 28 U.S.C. § 1350, as well as, in part, 28 U.S.C. §§ 1343(4) and 1331.

Because President Jiang was scheduled to be in Chicago on October 22 and 23 on his way to visit with United States President George W. Bush in Washington, D.C., the appellants moved *ex parte* for leave from the district court to effect service on President Jiang (and by extension Office 6/10) while he was in Chicago. The district court granted this motion and entered an order permitting service by delivery of a copy of the summons and complaint "to any of the security agents or hotel staff helping to guard" President

---

[3]  *Id.*

[4]  John Pomfret, "China Girds For a Battle Of the Spirit; Ruling Party Fears Religious Challenge," *Wash. Post*, Jan. 10, 2000, at A1.

Jiang.[5] The appellants contend that service was complete when they delivered a copy of these documents to a Chicago police officer and agents of the United States Secret Service detail stationed at the hotel at which President Jiang was staying in Chicago.

Neither President Jiang nor a representative of the Chinese government or Office 6/10 responded to the complaint, and the appellants moved for an entry of default. The United States, however, intervened pursuant to 28 U.S.C. § 517 and moved to vacate the service order or, in the alternative, to assert head-of-state immunity for President Jiang.[6] The United States further argued that President Jiang was personally inviolable and, therefore, incapable of being

---

[5] We express some concern at the enlistment of agents of the Executive Branch, particularly those charged with providing security for President Jiang's visit, to effectuate service. Our concern is grounded in separation of powers principles as well as the policy ramifications inherent in requiring a Secret Service agent to serve simultaneously as a security guard for a foreign dignitary and a *de facto* process server. Given the outcome of this case we need not thoroughly explore the matter, however, as the problem should not recur.

[6] The United States included with its motion before the district court a letter from William H. Taft, IV, Legal Adviser to the Department of State to Robert D. McCallum, Jr., an Assistant Attorney General with the Department of Justice. In that letter, Taft stated that "[t]he Department of State recognizes and allows the immunity of President Jiang from this suit."

Further, the United States' "amicus" brief to this court appears to be a collaborative effort of the State Department and the Department of Justice. We take the statements in this brief concerning the potential impact of the current suit to be more than simply the advocacy position of the government. We regard it as the official position of the Executive Branch.

served in any capacity. Specifically, the government argued that President Jiang could not be served as an agent of Office 6/10.

The district court accepted the United States' assertion of head-of-state immunity on behalf of President Jiang and dismissed the appellants' claims against him. The district court rejected, however, the government's argument of personal inviolability. Instead, the district court found that service of process on Office 6/10 could not be achieved through President Jiang because the appellants had not shown that President Jiang was either an agent or an officer of Office 6/10. Further, the district court held that, even assuming service of process on Office 6/10 could be effectuated through President Jiang, it lacked personal jurisdiction to hear claims against it. The district court, therefore, dismissed the appellants' complaint in its entirety. This appeal followed.

## II.

The appellants raise three issues on appeal. First, they argue that the district court erred when it accepted, as controlling, the United States' assertion of head-of-state immunity on behalf of President Jiang. Second, the appellants argue that the district court erred when it determined that President Jiang could not be served as an agent of Office 6/10. Finally, the appellants argue that the district court erred when it held that it lacked personal jurisdiction over Office 6/10.

### A.  *Head-Of-State Immunity—Some Background*

The appellants' first argument relates to the assertion by the United States, which the district court took as disposi-

tive, that President Jiang was immune from the appellants' suit. The appellants argue that the actions President Jiang is accused of amount to violations of "*jus cogens*" norms of international law and that immunity may not be conferred upon a person accused of violating these norms.

The Supreme Court recognized the immunity of foreign sovereigns from suits brought in United States courts nearly 200 years ago. In *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), Chief Justice Marshall reasoned that although "the jurisdiction of the United States over persons and property within its territory 'is susceptible to no limitation not imposed by itself,' . . . as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign." *Republic of Austria v. Altman*, 541 U.S. ___, slip op. at 9 (2004) (quoting *McFaddon*, 11 U.S. at 136). Following *McFaddon*, courts have been expected to "defer[ ] to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983).

For most of the next 165 years, the Executive Branch determined whether a foreign nation was entitled to immunity. The practice during this period was that the State Department would provide a court with a "suggestion of immunity." On reception of this "suggestion," courts would dismiss a suit, or any claims brought in a suit, against a foreign nation.

In 1952, the State Department adopted the "restrictive" theory of sovereign immunity. *See Verlinden*, 461 U.S. at 486-87. "Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly

commercial acts." *Id.* at 487. The restrictive theory was often honored in the breach: "On occasion, political considerations led to suggestions of immunity where immunity would not have been available under the restrictive theory." *Id.*

In 1976, Congress enacted the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1602 *et seq.* As an initial matter, the FSIA provides a foreign state with immunity from suit in courts of the United States or of any state. 28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts . . . ."). Such immunity is subject, however, to international agreements to which the United States was a party in 1976, as well as certain exceptions set forth in the FSIA. *Id.* These exceptions codify the restrictive theory of immunity. The responsibility for determining whether an exception applies is left to the courts. *See United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997) ("[The FSIA] codified the State Department's general criteria for making suggestions of immunity, and transferred the responsibility for case-by-case application of these principles from the Executive Branch to the Judicial Branch."). Insofar as a foreign state is concerned, therefore, the pre-1976 practice of courts reflexively deferring to the Executive Branch's immunity determinations has been eliminated.

The FSIA does not, however, address the immunity of foreign heads of states. The FSIA refers to foreign states, not their leaders.[7] The FSIA defines a foreign state to include a political subdivision, agency or instrumentality of a foreign

---

[7] In this way, the FSIA does not recognize (as *McFaddon* clearly did) the classical conflation of a head of state with the state itself (succinctly stated by King Louis XIV of France, "L'etat, c'est moi.").

state but makes no mention of heads of state. 28 U.S.C. § 1603(a). Because the FSIA does not apply to heads of states, the decision concerning the immunity of foreign heads of states remains vested where it was prior to 1976— with the Executive Branch. *Noriega*, 117 F.3d at 1212. ("Because the FSIA addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context, head-of-state immunity could attach in cases, such as this one, only pursuant to the principles and procedures outlined in [*McFaddon*] and its progeny. As a result, this court must look to the Executive Branch for direction on the propriety of Noriega's immunity claim.").

*B. The Present Case*

In this case the Executive Branch entered a suggestion of immunity. The appellants argue, however, that the Executive Branch has no power to immunize a head of state (or any person for that matter) for acts that violate *jus cogens* norms of international law. We have explained *jus cogens* norms before:

> A *jus cogens* norm is a special type of customary in-ternational law. A *jus cogens* norm " 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subse-quent norm of general international law having the same character.' " *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (*quoting* Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679). Most famously, *jus cogens* norms supported the prosecutions in the Nuremberg trials. *See Siderman*, 965 F.2d at 715 (9th Cir. 1992) ("The universal and fundamental rights of human

beings identified by Nuremberg—rights against geno-
cide, enslavement, and other inhumane acts . . .—are the
direct ancestors of the universal and fundamental
norms recognized as *jus cogens*.").

*Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1149-
50 (7th Cir. 2001).

The appellants' position, therefore, is that, in at least a
particular class of cases (those involving *jus cogens* norms),
a court cannot defer to the position of the Executive Branch
with respect to immunity for heads of states. The Supreme
Court has held, however, that the Executive Branch's sug-
gestion of immunity is conclusive and not subject to judicial
inquiry. *See Ex Parte Republic of Peru*, 318 U.S. 578, 589 (1943)
("The certification and the request that the vessel be de-
clared immune *must be accepted by the courts as a conclusive
determination* by the political arm of the Government that the
continued retention of the vessel interferes with the proper
conduct of our foreign relations.") (emphasis added);
*Compañia Española de Navegacion Maritime, S.A. v. The
Navemar*, 303 U.S. 68, 74 (1938) ("If [a claim of immunity by
a foreign government] is recognized and allowed by the
Executive Branch of the government, *it is then the duty of the
courts* to release the vessel upon appropriate suggestion by
the Attorney General of the United States, or other officer
acting under his discretion.") (emphasis added); *see also Spacil
v. Crowe*, 489 F.2d 614, 617 (5th Cir. 1974) ("The precedents are
overwhelming. For more than 160 years American courts
have consistently applied the doctrine of sovereign immu-
nity when requested to do so by the executive branch. More-
over, they have done so with no further review of the
executive's determination."); *Isbrandtsen Tankers, Inc. v.
President of India*, 446 F.2d 1198, 1201 (2d Cir. 1971) ("The
State Department is to make [an immunity determination]
in light of the potential consequences to our own interna-

tional position. Hence once the State Department has ruled in a matter of this nature, the judiciary will not interfere."); *Rich v. Naviera Vacuba S.A.*, 295 F.2d 24, 26 (4th Cir. 1961) ("[W]e conclude that the certificate and grant of immunity issued by the Department of State should be accepted by the court without further inquiry. We think that the doctrine of the separation of powers under our Constitution requires us to assume that all pertinent considerations have been taken into account by the Secretary of State in reaching his conclusion.") (internal citations omitted).[8]

The appellants present their argument as one of international law—under customary international law, a state cannot provide immunity to a defendant accused of violating *jus cogens* norms. Our first concern, however, is to ascertain the proper relationship between the Executive and Judicial Branches insofar as the immunity of foreign leaders is concerned. The obligation of the Judicial Branch is clear—a determination by the Executive Branch that a foreign head of state is immune from suit is conclusive and a court must accept such a determination without reference to the underlying claims of a plaintiff. *See Spacil*, 489 F.2d at

---

[8] As the foregoing citations show, many cases concerned with foreign sovereign immunity involve libel actions or other actions involving commercial marine vessels rather than a head of state. This distinction does not make a difference to the question at issue: whether a suggestion of immunity by the Executive Branch is dispositive. These authorities support the conclusive nature of the Executive Branch's determination of immunity with regard to heads of state. Courts appropriately accept an immunity determination as conclusive when it involves ships out of concern that the court might otherwise interfere with the foreign policy objectives of the Executive Branch. Clearly such concerns would be greater when the suggested immunity involves a foreign leader.

618 ("[W]e are analyzing here the proper allocation of functions of the branches of government in the scheme of the United States. We are not analyzing the proper scope of sovereign immunity under international law.").

Our deference to the Executive Branch is motivated by the caution we believe appropriate of the Judicial Branch when the conduct of foreign affairs is involved. *Cf. Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) ("[I]t is a guiding principle in determining whether a court should [recognize a suggestion of immunity] in such cases, that the courts should not so act as to embarrass the executive arm in its conduct of foreign affairs. 'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.' ") (quoting *United States v. Lee*, 106 U.S. 196, 209 (1882)); *Spacil*, 489 F.2d at 619 ("Separation- of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy."). The determination to grant (or not grant) immunity can have significant implications for this country's relationship with other nations. A court is ill-prepared to assess these implications and resolve the competing concerns the Executive Branch is faced with in determining whether to immunize a head of state. *Spacil*, 489 F.2d at 619 ("[T]he degree to which granting or denying a claim of immunity may be important to foreign policy is a question on which the judiciary is particularly ill-equipped to second-guess the executive. The executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary.").

Although our decision in *Sampson* was one of statutory interpretation, we believe it is also instructive here. In *Sampson*

we held that the FSIA did not include an implied exception[9] to its general grant of sovereign immunity to foreign states where a foreign state was accused of violating *jus cogens* norms.[10] *Id.* at 1156. Because the FSIA contained no such exception, Germany was immune from suit brought by a survivor of Auschwitz in the Northern District of Illinois.

Our interpretation of the FSIA confirmed that Congress could grant immunity to a foreign state for acts that amounted to violations of *jus cogens* norms. Just as the FSIA is the Legislative Branch's determination that a nation should be immune from suit in the courts of this country, the immunity of foreign leaders remains the province of the Executive Branch. The Executive Branch's determination that a foreign leader should be immune from suit even when the leader is accused of acts that violate *jus cogens* norms is established by a suggestion of immunity. We are no more free to ignore the Executive Branch's determination than we are free to ignore a legislative determination concerning a foreign state. *Cf. Hoffman*, 324 U.S. at 35 (1945) ("It is . . . not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize."). Pursuant to their respective authorities, Congress or the Executive Branch can create exceptions to blanket immunity. In such cases the courts would be obliged to respect such excep-

---

[9] Section 1605(a)(1) of the FSIA provides an exception to a nation's sovereign immunity in cases where a "foreign state has waived its immunity . . . by implication."

[10] At least three other circuits have reached a similar conclusion. *See Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 244 (2d Cir. 1997); *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1173 (D.C. Cir. 1994); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 719 (9th Cir. 1992).

tions. In the present case the Executive Branch has recognized the immunity of President Jiang from the appellants' suit. The district court was correct to accept this recognition as conclusive.

C.  *Service of Process on President Jiang to Reach Third Parties*

We turn next to Office 6/10. The appellants maintain that service on Office 6/10 was complete when President Jiang was served during his stay in Chicago. As recounted above, the United States argues that President Jiang's immunity extends to service aimed not at him, but at a third party.

The district court rejected the United States' immunity argument but, nonetheless, held that service on President Jiang was insufficient to reach Office 6/10 because the appellants had provided only conclusory evidence that President Jiang was, at the time of service, an officer or agent of Office 6/10. The district court also held that "even if Jiang was an agent or officer of Office 6/10 and thus capable of receiving service on its behalf, such service was insufficient to confer personal jurisdiction over Office 6/10 because the Office is not subject to the jurisdiction of Illinois courts."

Although the district court reached the correct result, it erred when it rejected the United States' argument concerning the scope of President Jiang's immunity. Because the Executive Branch has recognized President Jiang's immunity from suit, President Jiang could not be used as an involuntary agent of the appellants to effect service on Office 6/10. We need not therefore consider whether President Jiang was acting as an agent or officer of Office 6/10 or whether the district court had personal jurisdiction over Office 6/10.

We agree with the Executive Branch that its power to recognize the immunity of a foreign head of state includes the power to preclude service of process in that same suit on the head of state even where that service is intended to reach third parties.

Recognizing the immunity of a head of state and precluding service of process on a head of state are motivated by the same concern for the effective conduct of this nation's foreign affairs. As emphasized above, this responsibility is left to the political branches of this government. The Executive Branch has represented to this court that permitting service of process is often viewed by foreign governments and their heads of state "as an affront to the dignity of both the leader and the state." The Executive Branch has also indicated that "the potential for insult is the same, regardless of whether the service relates to the visiting head of state himself, or to service on the visiting leader in some purported representational or agency capacity." Finally, the Executive Branch has indicated that "[s]uch attacks on the dignity of a visiting head of state can easily frustrate our President's ability to reach this Nation's diplomatic objectives . . . ." The deference we extend the Executive Branch with regard to its determination of immunity, see pages 8-13 *supra*, is equally appropriate here. The Executive Branch is better equipped than this court or the district court to assess the consequences for our foreign policy of permitting service of process on visiting heads of state, and it is the Executive Branch in its dealings with China that will confront, in the first instance, the consequences of that determination.[11] *Cf. Hellenic Lines, Ltd. v. Moore*, 345 F.2d

---

[11] We want to emphasize the narrow reach of our holding. We are not holding (and the United States did not argue) that Office 6/10

(continued...)

978, 980-81 (D.C. Cir. 1965) (holding that the Ambassador of Tunisia was not properly subject to service directed to Tunisia after the State Department informed the court that "service would prejudice the United States foreign relations and would probably impair the performance of diplomatic functions."); *see also Spacil*, 489 F.2d at 619 ("[I]n the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves. Will granting immunity serve as a bargaining counter in complex diplomatic negotiations? Will it preclude a significant diplomatic advance; perhaps a detente between this country and one with whom we are not on the best speaking terms? These are questions for the executive, not the judiciary.") (internal citation omitted).

Also important to our decision is the treatment accorded the President of the United States in his travels abroad. The Executive Branch has stated that it would be a "great offense if foreign states and their courts were to encourage process servers to hound our President when he is abroad to conduct important negotiations with his foreign counterparts." Such concerns must weigh heavily in our determination that service of process should not be permitted on foreign heads of state visiting this country in the circumstances of this case.

The district court pointed to three factors when it rejected the United States' argument. First, the district court reasoned that service on a head of state where that service is directed towards a third party does not implicate the justifications for inviolability and immunity to the same degree

---

[11] (...continued)
is entitled to immunity from this suit. That issue is not before this court. We hold only that service on Office 6/10 could not be effectuated by service on President Jiang.

as service on a head of state when that service is directed towards the head of state himself. As we have just stated, however, we believe the Executive Branch is better equipped to make that determination.

Second, the district court noted that "the service provisions of the FSIA suggest that personal inviolability does not present an absolute bar to service in an agency capacity." The district court reasoned that "[b]ecause the FSIA does not foreclose the possibility that a diplomat may receive process as an agent, the statute lends weight to the proposition that inviolability does not bar service under all circumstances."

We are not concerned here, however, with "all circumstances" or whether there is an "absolute bar" to service of process on a diplomat or a head of state. We are concerned only with a narrow set of circumstances—whether a head of state may be the subject of service directed at a third party where the United States has recognized that head of state's immunity from suit in the action the service is related to, and the Executive Branch has indicated that permitting service would have a deleterious effect on the conduct of foreign affairs. There may be circumstances where it is permissible to serve a visiting head of state. For instance, the Executive Branch may not choose to recognize the immunity of a visiting head of state. In that case, service of process on the head of state would be permissible to reach the head of state himself and would, we suggest, be permissible where the service of process is also aimed at a third party (assuming, of course, an agency or similar relationship between the head of state and the third party).

The third factor cited by the district court is that "heads of state may not be immune in all situations." Citing *McFaddon*'s discussion of the exceptions to the immunity of foreign heads of state, *see McFaddon*, 11 U.S. at 145, the

district court held that "[t]hese limited exceptions to immunity presuppose that a head of state is amenable to service of process, even in instances when his presence in court may be required. Service of process therefore cannot be seen under all circumstances to be an affront to a head of state's inviolability."

The district court is correct that there are exceptions to the immunity a head of state (as well as a foreign nation) is granted in this country's courts. As we have discussed above, however, and the district court recognized elsewhere in its opinion, the determination that these exceptions apply to a head of state is left to the Executive Branch.[12] Likewise, the determination that service in the circumstances of this case would be detrimental to the Nation's foreign policy should be left to the Executive Branch.

## III.

In this case the Executive Branch has recognized President Jiang's immunity from the appellants' suit. We are required to defer to the decision of the Executive Branch. The Executive Branch has also determined that service of process by the appellants on President Jiang in order to reach an intended co-defendant in the same suit could frustrate this Nation's diplomatic objectives. It is appropriate to defer to that decision as well. Because we do so, service on Office 6/10 could not be effectuated through President Jiang. We need not reach, therefore, the question of whether President Jiang was, at the time of service, an officer or agent of Office 6/10 or whether the district court had personal jurisdiction over Office 6/10.

---

[12] Under the FSIA, whether an exception applies is determined by the Judicial Branch. As we have discussed, however, the FSIA does not apply to heads of state.

We conclude by stating that we are not unsympathetic to the appellants' claims. For the reasons stated above, however, we cannot permit this suit to go forward. The Executive Branch has stated it is working to persuade the government of China to put an end to the human rights violations it has inflicted on its people for more than half a century. Success depends on diplomacy, not United States courts.

AFFIRMED

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*