TERENCE T. EVANS, Circuit Judge.
A courtroom in Chicago, one would think, is an unlikely place for considering a case involving seven Nigerian citizens suing an eighth Nigerian for acts committed in Nigeria. It sounds like the sort of fare that would be heard in a courtroom on the African continent. But this case ended up in Chicago, and that leads us to consider the claims of seven Nigerian citizens against a Nigerian general over alleged *879 torture and murder in Nigeria. The' path the plaintiffs are pursuing is, as we shall see, quite thorny.
The plaintiffs make allegations of torture and killing at the hands of the military junta that ruled Nigeria from November 1993 until May 1999. The defendant, General Abdulsalami Abubakar, was a member of the junta and was Nigeria’s head of state for the last year' of the junta’s reign. Alleging that he was behind the atrocities, the plaintiffs sued General Abubakar and claimed that the United States district court had jurisdiction under 28 U.S.C. §§ 1331 and 1350. The district court considered motions for dismissal and for summary judgment. The specific issue which gives rise to this interlocutory appeal is the decision that the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1602 et seq., does not apply to individuals and thus General Abubakar is not immune from suit. The court determined, however, that General Abubakar is entitled to common law immunity for the year that he was head of state. Plaintiffs do not contest the latter finding.
The facts as we recite them come mainly from the plaintiffs’ claims which, at this stage of the suit, we accept as true. The situation in Nigeria at the time of these events was unstable. On December 31, 1983, General Muhammed Buhari staged a military coup that overthrew Nigeria’s democratically elected president and set off a series of coups and forced abdications. A number of military rulers were overthrown, one after another, and in June 9, 1998, defendant Abubakar assumed control of the regime following the sudden death of General Sani Abacha. Finally, a presidential election was held, and in May 1999, Nigeria had its first elected civilian president in 15 years.
During the various military regimes between 1983 and 1999, the highest governmental body was the Provisional Ruling Council (PRC). It was composed of military officials and a few civilians; whoever was the current military ruler was the chairman of the PRC. According to the complaint, the PRC ruled by decree and curtailed civil liberties. During this time, Abubakar occupied the third highest military and political position in Nigeria.
Plaintiff Hafsat Abiola is the daughter of Nigerian prodemocracy activists; she claims that Abubakar is responsible for the deaths of her parents. Her father, M.KO. Abiola, in fact, was a candidate for president in 1993. Plaintiff Abiola contends that the early election returns showed that her father won the vote, but the military regime nullified the election, leading to violent clashes between military forces and civilians. M.K.O. Abiola unsuccessfully challenged the election’s nullification through the Nigerian court system and sought Nigerian and international support for the recognition of the election results. In June 1994, M.K.O. Abiola declared himself the president of Nigeria. He was promptly arrested and charged with treason. According to the complaint, he was kept in prison under inhumane conditions, was tortured, and denied access to lawyers, doctors, and his family. He died in prison in July 1998, shortly after General Abubakar assumed control of the military regime.
Plaintiff Abiola’s mother, Alhaja Kudirat Abiola, was also a pro-democracy activist. After her husband was imprisoned she began a campaign to free him and continued a call for the democratization of Nigeria. The complaint alleges that she received menacing telephone calls warning her of the consequences of continuing to demand the release of her husband. In June 1996, she was murdered in broad daylight in her car on the streets of Lagos City. She had been shot multiple times.
*880 Plaintiff Anthony Enahoro is a political activist who played a leading role in Nigeria’s independence from Great Britain in 1960. In 1994, when he was 70 years old, he was arrested and imprisoned by the junta for 4 months. During his detention he was not provided medical treatment even though he was a diabetic. Plaintiff Arthur Nwankwo, another political activist, was arrested in June 1998. He claims he was stripped naked, flogged, and taken away in the trunk of a car. He also was denied medical treatment for the 2 months he was in custody.
Based on these allegations, the complaint states seven claims: torture; arbitrary detention; cruel, inhuman and degrading treatment; false imprisonment; assault and battery; intentional infliction of emotional distress; and wrongful death.
As we said, General Abubakar appeals from the denial of immunity under the FSIA. The preliminary issue is whether we have appellate jurisdiction over the appeal. We conclude that we do.
We stated in Rush-Presbyterian-St. Luke’s Medical Center v. The Hellenic Republic, 877 F.2d 574, 576 n. 2 (7th Cir.1989):
Since sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits, the denial of a claim of sovereign immunity is an immediately appealable interlocutory order under the “collateral order doctrine” of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 545-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). See Compania Mexicana De Aviacion, S.A v. United States Dist. Court, 859 F.2d 1354, 1358 (9th Cir.1988) (per curiam); Segni v. Commercial Office of Spain, 816 F.2d 344, 347 (7th Cir.1987).
Our is not an isolated opinion. See S & Davis Int’l, Inc. v. The Republic of Yemen, 218 F.3d 1292 (11th Cir.2000); In re Republic of Philippines, 309 F.3d 1143 (9th Cir.2002); Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020 (D.C.Cir.1997). That said, we turn to the appeal.
General Abubakar contends that he has immunity for official conduct taken while he was a Nigerian public official and a member of the ruling .council. Underlying his argument is his contention that the FSIA applies to individuals in government, not just foreign governments and agencies.
The historical underpinnings of the FSIA go back almost 200 years.- In Schooner Exchange v. McFaddon, 11 U.S. (7 Crunch) 116, 3 L.Ed. 287 (1812), the Supreme Court recognized the immunity of foreign sovereigns from suits brought in the courts of the United States. Justice Marshall said that “as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign.” Republic of Austria v. Altmann, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (quoting McFaddon, 11 U.S. at 136). For the next 165 years, the executive branch decided whether a foreign nation was entitled to immunity. The usual procedure was that the State Department would provide the court with a “suggestion of immunity” and the court would dismiss the suit. See 15 Moore’s Federal Practice, § 104.02 (Matthew Bender 3d ed.).
But in 1952, the State Department adopted what has become known as the “restrictive theory” of sovereign immunity. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Under this theory, immunity is *881 limited to suits involving the sovereign’s public acts and does not extend to cases arising out of strictly commercial actions.
In 1976, Congress got into the act, passing the FSIA. Under the FSIA, a foreign state is “presumptively immune from the jurisdiction of United States courts .... ” Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). That immunity exists unless one of the statutory exceptions to immunity applies. See 28 U.S.C. §§ 1605 & 1607. Ironically, however, the FSIA is also the sole basis for jurisdiction over a foreign state. Title 28 U.S.C. §§ 1604 and 1330(a) work together. Section 1330 confers jurisdiction when the state is not entitled to immunity under one of the exceptions in the FSIA. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).
In this case, no one contends that an exception to immunity applies. If Abubakar is covered by the FSIA, he is immune; no exception is relevant; and the suit would have to be dismissed. Therefore, the only issue is whether the statute applies to individuals, who are connected with the government, as opposed to the state itself and its agencies. We have recently looked at a similar question. Ye v. Zemin, 383 F.3d 620 (7th Cir.2004), involved a head of state, and we concluded that the FSIA did not apply to heads of state: “The FSIA defines a foreign state to include a political subdivision, agency or instrumentality of a foreign state but makes no mention of heads of state.” Ye, 883 F.8d at 625. We noted that the FSIA did not seem to subscribe to Louis XIV’s not-so-modest view that “L’etat, c’est moi.” How much less, then, could the statute apply to persons, like General Abubakar, when he was simply a member of a committee, even if, as seems likely, a committee that ran the country?
The language of the Act supports our conclusion. The overriding concern of the Act, as set out in 28 U.S.C. § 1602, is allowing judgments against foreign sovereigns “in connection with their commercial activities.” The statute was passed so im: munity determinations in such contexts would be made “by courts of the United States and of the States ... ”, not by the executive branch of the government. Section 1604 provides that a “foreign state” is immune unless certain exceptions apply. Under § 1603(a), a foreign state includes “a political subdivision of a foreign state or an agency or instrumentality of a foreign state ....” In turn,
(b) [a]n “agency or instrumentality of a foreign state” means any entity — (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title nor created under the laws of any third country.
The definition does not explicitly include individuals who either head the government or participate in it at some high level.
Abubakar argues, however, that “separate legal person” must mean an individual. We suppose it could. But if it was a natural person Congress intended to refer to, it is hard to see why the phrase “separate legal person” would be used, having as it does the ring of the familiar legal concept that corporations are persons, which are subject to suit. Given that the phrase “corporate or otherwise” follows on the heels of “separate legal person,” we are convinced that the latter phrase refers to a legal fiction — a business entity which is a legal person. If Congress meant to *882 include individuals acting in' the official capacity in the scope of the FSIA, it would have done so in clear and unmistakable terms.
It is true, however, that this issue is a long'way from being settled. The FSIA has been applied to individuals, but in those cases one thing is clear: the individual must have been acting in his official capacity. If he is not, there is no immunity. For instance, a Korean official being sued by a personal family employee was not immune because he was not acting within the scope of his official duties. Park v. Shin, 313 F.3d 1138 (9th Cir.2002).
That same court, though, in Chuidian v. Philippine National Bank, 912 F.2d 1095, 1101 (9th Cir.1990), looked at the statute and concluded that its language — the terms agency, instrumentality, organ, entity, and legal person — “while perhaps more readily connoting an organization or collective, do not in their typical legal usage necessarily exclude individuals.” Because Congress did not exclude individuals, the court concluded that if the individual was acting in his official capacity, the FSIA was applicable. We are troubled by this approach — that is, by saying Congress did not exclude individuals; therefore they are included. Not only does it seem upside down as a matter of logic, but it ignores the traditional burden of proof on immunity issues undér the FSIA. The party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA’s definition of a foreign state. Then the burden of going forward shifts to the plaintiff to produce evidence that the entity is not entitled to immunity. The ultimate burden of proving immunity rests with the foreign state. Int’l Ins. Co. v. Caja Nacional De Ahorro Y Seguro, 293 F.3d 392, 397 (7th Cir.2002); Keller v. Central Bank of Nigeria, 277 F.3d 811, 815 (6th Cir.2002); Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 241 (2nd Cir.2002).
A case which is similar to the one before us is In re Estate of Ferdinand E. Marcos Human Rights Litigation, 978 F.2d 493 (9th Cir.1992). Archimedes Trajano, a student, went to an open forum in the Philippines where Imee Marcos-Mano-toc — the daughter of Ferdinand Marcos, the former Philippine President — was speaking. Trajano apparently asked the wrong question at the forum and was kid-naped, interrogated, and tortured to death by military intelligence personnel who were acting in part under the authority of Marcos-Manotoc. A wrongful death suit, filed in the United States District Court for the District of Hawaii, followed, and a preliminary question was whether Marcos-Manotoc was entitled to immunity under the FSIA. Because Marcos-Manotoc was in default, she was said to have admitted that she acted on her own authority and not on the authority of the Republic of the Philippines. Therefore, she was not entitled to immunity. That also meant that there was also no jurisdiction under the FSIA and that the Alien Tort Statute (ATS) was the sole basis for jurisdiction in the case.
In our case, we conclude, based on the language of the statute, that the FSIA does not apply to General Abubakar; it is therefore also clear that the Act does not provide jurisdiction over the case. If General Abubakar were covered, the FSIA would be the only basis for subject matter jurisdiction over him. As we indicated above, the Supreme Court has said in Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989):
We think that the text and structure of the FSIA demonstrate Congress’ intention that the FSIA be the sole basis *883 for obtaining jurisdiction over a foreign state in our courts.
The corollary proposition in Argentine Republic is that the Alien Tort Statute cannot provide jurisdiction over foreign sovereigns but remains a jurisdictional basis for suits against other defendants. And the ATS is, in fact, the basis on which plaintiffs in our case claim jurisdiction.
Because we are obligated to consider our jurisdiction at any stage of the proceedings, we now turn to the ATS as it forms a basis for jurisdiction in this case. The ATS provides that
[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
Our examination of the statute is particularly compelling at this time because recently (after the district court issued its decision in this case) the Supreme Court extensively considered the ATS. Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), established that the ATS is a jurisdictional statute that creates no new causes of action. The concept is not as simple as it sounds.
The Sosa case grew out of the capture in Mexico of a 'Drug Enforcement Administration agent who was taken to a house in Guadalajara, where he was tortured over the course of a 2-day interrogation and then murdered. DEA officials in the United States came to believe that Humberto Alvarez-Machain (Alvarez), a Mexican physician, was present at the house and acted to prolong the agent’s life so that the interrogation and torture could be extended. Alvarez was indicted in the United States District Court for the Central District of California. The DEA asked the Mexican government to help obtain Alvarez’s presence in the United States. When that failed, the DEA hired Mexican nationals, including Jose Francisco Sosa, to seize Alvarez and bring him to the United States from Mexico. Sosa and the others abducted Alvarez, held him overnight in a motel, and brought him by private plane to El Paso, Texas, where he was arrested by federal officers. Eventually, Alvarez went to trial, but the district court granted his motion for a judgment of acquittal. After returning to Mexico, Alvarez filed suit in the Central District of California against Sosa and others under the Federal Tort Claims Act, 28 U.S.C. § 2674, and the ATS.
Als relevant here, Sosa argued that the action under the ATS should be dismissed because the statute merely provided the court with jurisdiction but did not authorize the courts to recognize any particular right of action without further congressional action. On the other hand, Alvarez argued that the statute was not simply a jurisdictional grant but was authority for the creation of a new cause of action for torts in violation of international law. The Court found that the statute was intended as jurisdictional “in the sense of addressing the power of the courts to entertain cases concerned with a certain subject.” At 2755. But it also reasoned that when Congress enacted the statute in 1789, it did not enact a “stillborn” statute which could not provide a claim for relief without a further statute expressly authorizing a cause of action. Examining international law at the time of enactment, the Court found that specific recognized violations of the law of nations were probably in the minds of the drafters of the ATS. These included safe conducts, infringement of the rights of ambassadors, and piracy. Thé Court stated: '•
[Although the ATS is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was *884 intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.
At 2761.
But, the Court cautioned,
there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a speck-ficity comparable to the features of the 18th-century paradigms we have recognized. •
At 2761-62.
In sum, “the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant door-keeping ....” At 2764.
Alvarez’s case against Sosa was properly dismissed because a “single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy.” At 2769.
Because the ATS provides jurisdiction over a very limited number of claims and the jurisdictional grant is so closely tied to the claim, we need to examine whether there is a claim in this case which allows for the exercise of jurisdiction. See Kadic v. Karadzic, 70 F.3d 232, 238 (2nd Cir.1995) (“Because the Alien Tort Act requires that plaintiffs plead a ‘violation of the law of nations’ at the jurisdictional threshold,- this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible ‘arising under’ formula of section 1331.”).
The plaintiffs before us allege significantly more appalling violations than did Alvarez. Their allegations fall into two primary categories that the Sosa Court specifically recognized as violations of the law of nations: torture and killing. The Court also noted that Congress has provided an “unambiguous” basis for “federal claims of torture and extrajudicial killing” in the Torture Victim Protection Act of 1991, 106 Stat. 73. Sosa, 124 S.Ct. at 2763.[1]
This would seem to be positive news for the plaintiffs. But that may not necessarily be so. In the district court, Abubakar argued that because the plaintiffs had not complied with the exhaustion requirement in the Torture Victim Protection Act, their case should be dismissed. The district judge rejected the argument because the plaintiffs had not pled their case under the Act and therefore had no need to comply with its requirements. The implication of the district court’s decision is that there are two bases for relief against torture and extrajudicial killing: the statute and independently existing common law of nations condemning torture and killing. The issue, then, becomes whether both can simultaneously exist to provide content to the ATS. In other words, does the Torture Victim Protection Act occupy the field or could a plaintiff plead under the Act and/or under the common law?
We find that the Act does, in fact, occu *885 py the field.[2] If it did not, it would be meaningless. No one would plead a cause of action under the Act and subject himself to its requirements if he could simply plead under international law. While there is no explicit statement to this effect in Sosa, the implications are that the cause of action Congress provided in the Torture Victim Protection Act is the one which plaintiffs alleging torture or extrajudicial killing must plead. As we said, the Court found that Act an “unambiguous” basis for such claims. The Court went on to say that the affirmative authority is confined to its specific subject matter, and that the legislative history says that § 1350 should “remain intact to permit suits based on other norms that already exist or may ripen in the future into rules, of customary international law,” but the Court said Congress had done nothing to promote other such suits. Id. The Court emphasizes that “great caution” must be taken to adapt the laws of nations to private rights. It requires “vigilant doorkeeping.” The Court was concerned with “collateral consequences” of making international rules privately actionable:
[T]he subject of those collateral consequences is itself a reason for a high bar to new private causes of action for violating international law, for the potential implications for the foreign relations of the United States of recognizing such causes should make court particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign .affairs. Since many attempts by federal courts to craft remedies for the' violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution.
*886 Id. It is hard to imagine that the Sosa Court would approve of common law claims based on torture and extrajudicial killing when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed. As relevant to this case, then, the ATS would provide jurisdiction over a suit against General Abubakar for violations of the Torture Victim Protection Act.
But, as we mentioned, one procedural requirement in the Act is exhaustion. Section 2(b) says:
A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.
It may be that a requirement for exhaustion is itself a basic principle of international law. In Sosa, the European Commission filed a brief as amicus curiae arguing that “basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other for a such as international claims tribunals.” Sosa at 2766 n. 21. The Court commented that it “would certainly consider this requirement in an appropriate case” and notes that the Torture Victim Protection Act has such a requirement. Id.
The plaintiffs before us have not pled under the Torture Victim Protection Act, and nothing in the record indicates that they have exhausted their remedies. We will remand this case to the district court for a determination regarding whether the plaintiffs should be allowed to amend their complaint to state such a claim and, if they do, whether, in fact, the exhaustion requirement in the Torture Victim Protection Act defeats their claim. We 'therefore AFFIRM the decision of the district court concluding that General Abubakar is not immune from suit under the FSIA and REMAND the case to the district court for proceedings consistent with this opinion. Each side shall bear their own costs.

. Tellingly, the Torture Victim Protection Act is inserted in the United States Code under the Historical and Statutory Notes of the ATS (28U.S.C. § 1350).

. The dissent cites Kadic for the proposition that the "scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim Act.” The court, however, made this pronouncement as a gloss on FLR.Rep. No. 367, 102d Cong., 2d Sess., at 4 (1991), which stated that
(c)laims based on torture and summary executions do not exhaust the list of actions that may appropriately be covered [by the Alien Tort Act]. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.
The latter statement does not, we think, necessarily say that there are now two routes for claims based on torture and killing to take. Rather, it indicates that the enactment of the Torture Victim Protection Act did not signal that torture and killing are the only claims which can be brought under the Alien Tort Statute. Other claims, in addition to tqrture and killing as provided for in the Torture Victim Protection Act, can still be recognized under the ATS as well. That issue, however, does not concern us in this case. We also think that the court in Flores v. Southern Peru Copper Corp., 343 F.3d 140 (2nd Cir.2003), was cognizant that the relationship between the statutes was murky. In discussing what the Tort Victim Protection Act was intended to accomplish, the court said:
(N)either Congress nor the Supreme Court has definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA.
It is true that, in affirming the district court's dismissal of all claims in the case, the court in Beanal v. Freeport-McMoran, Inc., 197 F.3d 161 (5 th Cir.1999), discussed separately claims under the ATS and the Torture Victim Protection Act. There was, however, no need for the court to reach difficult questions such as the relationship between the two statutes when the plaintiffs complaint failed entirely. Further, that the ATCA confers a private right of action is not contested in the case before us (as it was in Abebe-Jira v. Negewo, 72 F.3d 844 (11th Cir.1996)), nor is the fact that one interpretation of the Torture Victim Protection Act is that it codified existing law, especially as set out in Filartiga v. Pena-Irala, 630 F.2d 876 (2nd Cir.1980). In short, we think that the law on the issue before us is far from settled in the courts of appeals, but that the Supreme Court in Sosa offers us the best guidance as to what the relationship between these two statutes should be.