# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 10, 2007          Decided February 15, 2008

No. 07-7009

ALI SAADALLAH BELHAS ET AL.,
APPELLANTS

v.

MOSHE YA'ALON, FORMER HEAD OF ARMY INTELLIGENCE
ISRAEL,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 05cv02167)

*Judith Brown Chomsky* argued the cause for appellants. With her on the briefs were *Katherine Gallagher*, *Maria LaHood*, *Jennifer Green*, and *James Klimaski*.

*Moira I. Feeney* was on the brief for *amicus curiae* Center for Justice & Accountability in support of appellant.

*Robert N. Weiner* argued the cause and filed the brief for appellee Moshe Ya'alon.

Before: SENTELLE, *Chief Judge*; HENDERSON, *Circuit Judge*; and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

SENTELLE, *Chief Judge*: Appellants brought this action seeking damages for injuries and deaths resulting from a battle between Israel and the terrorist organization Hezbollah along the Lebanese border. The defendant, a retired general of the Israeli Defense Forces ("IDF"), had become available for service of process by visiting the United States as a fellow at a Washington, D.C., think tank. The district court dismissed the action for lack of jurisdiction, citing the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–11 ("FSIA"). *Belhas v. Ya'alon*, 466 F. Supp. 2d 127 (D.D.C. 2006). Because the district court is entirely correct, we affirm.

## I. BACKGROUND

We note first in setting forth the factual background of this litigation that the district court entered the judgment of dismissal on defendant's motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss the action for lack of subject matter jurisdiction. As the district court noted, "[w]hile generally a court must accept the allegation[s] in a complaint as true and construe[] all inferences in plaintiffs' favor on a motion to dismiss, where the motion is based 'on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability . . . the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case.'" *Belhas*, 466 F. Supp. 2d at 128 (quoting *Jungquist v. Al Nahyan*, 115 F.3d 1020, 1027-28 (D.C. Cir. 1997)). Therefore, our background statement, while drawn largely from the allegations of the complaint, will occasionally make reference to other filings with the district

court during the course of litigation.

Defendant, General Moshe Ya'alon, served as Head of Army Intelligence from 1995 to 1998. During this time, Army Intelligence conducted cross-border intelligence-gathering operations with its small semi-autonomous air force. Army Intelligence passed along communications intercepts, target studies, daily intelligence reports, and risk of war estimates to the Prime Minister and his cabinet.

Meanwhile, in April 1996, the IDF's Northern Command, a unit responsible for patrolling Israel's northern border with Lebanon, launched "Operation Grapes of Wrath" in southern Lebanon. The operation's purpose was to exert pressure on the Lebanese government to disarm Hezbollah guerrilla forces operating in southern Lebanon. At the beginning of the military operation, the IDF broadcast warnings via radio to Lebanese civilians living in the target area, stating that those who remained in towns in the south of Lebanon would be considered connected with Hezbollah. Several hundred civilians, including Plaintiffs, chose to remain in southern Lebanon and relocate to a United Nations ("UN") compound in a town called Qana. The complaint alleges that Ya'alon "also had command responsibility for the attack," although it offers no factual allegation as to how he, as head of intelligence, fit in the chain of command of the operational units conducting the shelling.

The complaint alleges, on information and belief, that Israeli helicopters were present in Qana and able to observe civilians in the UN compound. Appellants further allege that communications from these helicopters put General Ya'alon on actual notice of the presence of civilians in the compound. The IDF subsequently shelled Qana, and Plaintiffs claim that General Ya'alon, acting "under the actual or apparent authority and/or color of law of the State of Israel, . . . failed to take

appropriate and necessary measures to prevent troops" from shelling civilians there. Compl. ¶¶ 50, 98. More than a hundred died and many others were injured.

Appellants are relatives of civilians who died or were injured in the UN compound during the shelling of Qana. On November 4, 2005, they brought suit under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 (note), alleging that the above acts constitute war crimes, extrajudicial killing, crimes against humanity, and cruel, inhuman or degrading treatment or punishment perpetrated by General Ya'alon. On February 21, 2006, General Ya'alon moved to dismiss for lack of subject matter jurisdiction and attached a letter from the Ambassador of the State of Israel to the United States. The letter stated that "anything [General Ya'alon] did in connection with the events at issue in the suit[] was in the course of [his] official duties, and in furtherance of official policies of the State of Israel. To allow a suit against [General Ya'alon] is to allow a suit against Israel itself." Letter from Daniel Ayalon, Ambassador to the United States, State of Israel, to Nicholas Burns, Under Secretary for Political Affairs, State Department (Feb. 6, 2006).

The district court ordered the case dismissed, holding that the complaint only alleged acts done by General Ya'alon in his official capacity as head of intelligence for the defense forces of the State of Israel. Because the FSIA confers immunity upon any individual acting in his official capacity for a foreign state, and no exception to the FSIA applied to this case, the court held that the FSIA bars suit. *See Belhas*, 466 F. Supp. 2d at 130 (citing 28 U.S.C. §§ 1603-04; *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996)). The court rejected Plaintiffs' arguments that the FSIA does not protect officials alleged to have acted outside their scope of lawful authority

under international or domestic law and that the TVPA abrogates the FSIA to the extent the statute applies to individuals. *Id.* at 131-32. The district court also denied Plaintiffs' request for jurisdictional discovery. *Id.* at 133. Plaintiffs appealed both conclusions.

## II. ANALYSIS

On appeal, Plaintiffs contend that the district court erred by granting Defendant's motion to dismiss. Like all federal courts, the district court is a court of limited jurisdiction. *See, e.g.*, *City of Kenosha v. Bruno*, 412 U.S. 507, 511 (1973). As such, it possesses jurisdiction only over such matters as are committed to it by statute. The Supreme Court has consistently held that the FSIA's enumerated exceptions provide the only path to jurisdiction over foreign states in US courts. *See Permanent Mission of India to the United Nations v. City of New York*, 548 U.S. __, 127 S. Ct. 2352, 2355 (2007) (citing 28 U.S.C. § 1604; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)); *see also Princz v. F.R.G.*, 26 F.3d 1166, 1169 (D.C. Cir. 1994). The "general exceptions to the jurisdictional immunity of a foreign state" are set forth in 28 U.S.C. § 1605.

## A. *Application of the Foreign Sovereign Immunities Act*

Instead of suing the foreign state of Israel, something prohibited by the FSIA in the absence of allegation of any of the statutory exceptions, Plaintiffs sued a retired Israeli general with at most a tangential relationship to the events at issue who made a convenient visit to the District of Columbia. But the FSIA is not written so narrowly as to exclude all but foreign states in name. It applies to foreign states, their political subdivisions, and their agencies and instrumentalities. 28 U.S.C. §§ 1603–04. Furthermore, "[a]n individual can qualify as an 'agency or instrumentality of a foreign state.'" *El-Fadl*, 75 F.3d at 671

(citing 28 U.S.C. § 1603(b); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101–03 (9th Cir. 1990)). An individual qualifies for this immunity when he acts in his official capacity for the state. *See Jungquist*, 115 F.3d at 1027.

The district court correctly concluded that Plaintiffs have only alleged acts done in General Ya'alon's official capacity and have in no instance alleged acts that were either personal or private in nature. *See id.* at 1028 (finding that the district court reasonably concluded that defendant's actions were "personal and private rather than official in nature" based in part on a statement by the defendant's superior that if he had done the alleged acts he would take him "for a walk in the desert"—meaning kill him). According to the complaint, at the time of the shelling in Qana, General Ya'alon was Head of Army Intelligence for the IDF and was acting "under the actual or apparent authority and/or color of law of the State of Israel." Compl. ¶ 98. Appellants further alleged that he "had command responsibility for the attack." *Id.* ¶ 2. Nothing in the complaint indicates that General Ya'alon took part in any events related to the shelling of Qana that were outside his official authority and role as the head of intelligence for the IDF.

In cases involving foreign sovereign immunity, it is also appropriate to look to statements of the foreign state that either authorize or ratify the acts at issue to determine whether the defendant committed the alleged acts in an official capacity. *See, e.g.*, *Jungquist*, 115 F.3d at 1025 (noting affidavits submitted to the district court to help determine whether the defendant was entitled to foreign sovereign immunity); *see also Hilao v. Estate of Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994) (citing a letter from the Philippine government urging the court to exercise jurisdiction over its former leader and holding that "Marcos' acts of torture, execution, and disappearance were clearly acts outside of his authority as President"); *Doe I v. Qi*,

349 F. Supp. 2d 1258, 1285-87 (N.D. Cal. 2004) (looking to both public proclamations and documents produced by the People's Republic of China ("PRC")). In fact, it is incumbent upon the court to "engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case" when a party claims it is entitled to foreign sovereign immunity. *Jungquist*, 115 F.3d at 1027–28 (internal quotations omitted). Here, the Israeli ambassador to the United States transmitted a letter stating that General Ya'alon's alleged acts were done "in the course of [his] official duties, and in furtherance of the official policies of the State of Israel. To allow a suit against [this] former official[] is to allow a suit against Israel itself." This is a case—anticipated by those who enacted the TVPA—in which the state "admit[s] some knowledge or authorization of relevant acts." 138 Cong. Rec. S2667-04, S2668 (daily ed. Mar. 3, 1992) (statement of Sen. Specter on passage of the TVPA). In light of the absence of any indication in the complaint that General Ya'alon acted outside his scope of authority and the Israeli ambassador's statement that his actions were within the authority given to him by the State of Israel, General Ya'alon qualifies for the immunity provided by the FSIA.

Upon review of their complaint it appears that appellants pleaded themselves out of court. The complaint identifies nothing that General Ya'alon is alleged to have done in an individual capacity, or other than as an agent or instrumentality of the state of Israel. Indeed, the complaint alleges nothing that General Ya'alon did at all. The factual allegations of tortious conduct all concern acts allegedly done by the military of the state of Israel in the conduct of hostile operations. The personal liability of General Ya'alon seems to be entirely based on the proposition that the "defendant, acting singly and in concert with others," conducted a military operation which was rather plainly on behalf of the state of Israel. The complaint alleges nothing that appellee allegedly did himself. Indeed, the critical portions

of the complaint alleging specific wrongful "acts" by Ya'alon which allegedly caused the harm to the plaintiffs all consist of claims that at a time when Ya'alon "knew or should have known that Lebanese civilians sought shelter" in the United Nations compound, he did nothing to prevent it. Since there is nothing in an individual capacity that Ya'alon or any other individual not acting as an agent of the Israeli government could have done to stop the military actions of the IDF, on the face of plaintiffs' complaint it is apparent that any argument that he acted in an individual capacity rendering him unprotected by the FSIA is meritless.

We have no difficulty in holding that the district court properly ruled that the FSIA does not extend jurisdiction over this action against an officer for actions committed by the state in whose army he served.

B. *Appellants' Claimed Exceptions to the FSIA*

Appellants offer several arguments in support of the proposition that the district court erred in dismissing their action even in the face of the FSIA's apparent jurisdictional bar. We reject each of these in turn.

1. The Termination of Service Argument

Appellants first argue that the FSIA does not apply to a foreign official who has left office between the time of the commission of the challenged acts and the bringing of the litigation. We need not ultimately decide the merits of this argument, as it is not properly before us. Appellants did not raise this issue in the district court. Absent exceptional circumstances, a party cannot raise legal issues on appeal that it failed to raise in the district court. *Nemariam v. Fed. Democratic Republic of Eth.*, 491 F.3d 470, 483 (D.C. Cir.

2007). As the issue is not properly before us, this is not a proper case for us to decide this question of statutory interpretation.

While we will not decide the issue, we feel compelled to advise that our refusal to enter a holding on the question does not mean that we consider this novel argument to be a compelling one or the question to be difficult. Indeed, it is likely that we would reject the proposition were it before us on the merits. The argument relies on the undeniable proposition that General Ya'alon's status as "an agency or instrumentality of a foreign state" is the basis for his immunity. *See* 28 U.S.C. § 1603(a)–(b); *El-Fadl*, 75 F.3d at 671. Appellants note that section 1603(b), which defines an agency or instrumentality as any entity "which is an organ of a foreign state or political subdivision," speaks in the present tense. 28 U.S.C. § 1603(b) (emphasis added). Appellants claim that because section 1603(b) of the FSIA uses the word "is" and not "was," it fails to protect defendants who are no longer foreign officials at the time of suit. Because General Ya'alon served as Head of Army Intelligence from 1995 to 1998 and Plaintiffs did not bring suit until 2005, under their construction of the statute he does not qualify for foreign sovereign immunity. To support their statutory interpretation argument, appellants cite *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), which they argue settled this issue in their favor.

Appellants ask us to hold that a public official protected by the sovereign immunity of his country at the time he performs acts on behalf of the government loses that protection on the day he resigns or reaches the expiration of his term. Aside from the fact that such a holding makes no practical sense, it would be a dramatic departure from the common law of foreign sovereign immunity, as codified in the FSIA. The Supreme Court recently reiterated that one "well-recognized" purpose of the FSIA was the "codification of international law at the time of the FSIA's

enactment." *Permanent Mission of India*, 548 U.S. at __, 127 S. Ct. at 2356. In 1976, it was well settled that sovereign immunity existed for "any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 66(f) (1965). The common law of foreign sovereign immunity made no distinction between the time of the commission of official acts and the time of suit. When Congress codified the common law in the FSIA, it retained this same protection for foreign officials. *See Chuidian*, 912 F.2d at 1099–1100. In light of the above "well-recognized" purpose of the FSIA, it is unreasonable to assume that in enacting the FSIA, Congress intended to make such sweeping and counterintuitive changes to foreign sovereign immunity with the simple use of the word "is."

*Dole Food* does not appear to support the proposition advanced by appellants. It resolved only two questions, neither of which is relevant to this case—"whether a corporate subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary" and "whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time suit is filed." *Dole Food*, 538 U.S. at 471. Although the Court held that a corporation's instrumentality status is defined at the time of suit, *id.* at 478, relying in part on the statute's use of the present tense of "is owned," 28 U.S.C. § 1603(b)(2), the case never dealt with the acts of a government official. The status of a corporation at one time owned by a foreign state and an individual who was at one time an official of such a state are hardly the same. The corporation and the state have at all times been entities wholly separate and distinguishable from each

other and able to act without the presence or even existence of the other. This does not define the relationship between the state and its officials. While it is true, indeed obvious, that the official has an existence independent of the state, the state does not act independently of its agents. Every act committed by a sovereign government is carried out by its officials and agents. While the state may own corporations that conduct some of these acts, it need not do so. Regardless of whether it creates or owns corporations, individual officials or agents must act as instrumentalities for anything actually to be done. To suppose that the sovereign's immunity protecting the individual official in the performance of his sovereign's business vanishes the moment he resigns, retires, or loses an election is to establish that he had no immunity at all. Even though the state's immunity survives his departure, it is difficult to say how it could act within its immunity without being able to extend that immunity to the individual officials who acted on its behalf.

While *Dole Food* was not dealing with appellants' novel theory, the court did offer language in that case relevant to this argument. The *Dole Food* Court opined that a purpose of foreign sovereign immunity is "to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns." 538 U.S. at 479. To allow the resignation of an official involved in the adoption of policies underlying a decision or in the implementation of such decision to repeal his immunity would destroy, not enhance that comity. This is especially true in a case like the present one where we would be engaging in the micro-management of military targeting decisions. All this is even assuming that appellants have alleged a claim for relief when all they seem to be able to support is the proposition that appellee was a high-ranking military official at the time the actions were undertaken.

2.  The *Jus Cogens* Exception

Appellants next argue that General Ya'alon acted contrary to *jus cogens* norms of international law and therefore outside any scope of authority that would provide protection from suit.

> [A] *jus cogens* norm, also known as a "peremptory norm" of international law, "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."

*Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 332); *see also Princz*, 26 F.3d at 1173.  Appellants claim that any act that violates a *jus cogens* norm must, by definition, be outside the scope of the individual's authority because no sovereign can authorize *jus cogens* violations.  *See Enahoro v. Abubakar*, 408 F.3d 877, 893 (7th Cir. 2005) (Cudahy, J., dissenting) ("[O]fficials receive no immunity for acts that violate international *jus cogens* human rights norms (which by definition are not legally authorized acts.)"); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996) (noting that the defendant did not argue, "nor could he," that torture fell within the scope of his authority or was permitted under his nation's laws, because no government asserts a right to torture) (citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980)); *Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Judgement, ¶ 156 (Dec. 10, 1998) (noting the inconsistency of preventing courts from prosecuting torturers when no state has the lawful authority to torture).  Appellants claim that their allegations of war crimes, extrajudicial killing, crimes against humanity, and cruel, inhuman or degrading treatment or punishment constitute violations of *jus cogens*

norms.

It is not necessary for this Court to reach the issue of whether the acts alleged by Plaintiffs constitute violations of *jus cogens* norms because the FSIA contains no unenumerated exception for violations of *jus cogens* norms. In *Princz*, we rejected this precise argument in the context of the waiver exception to the FSIA. 26 F.3d at 1173. *Amici* had argued that the Third Reich implicitly waived Germany's sovereign immunity under the FSIA by violating *jus cogens* norms. *Id.* Relying in part on *Siderman*, 965 F.2d at 715, this Court held that although "it is doubtful that any state has ever violated *jus cogens* norms on a scale rivaling that of the Third Reich," even violations of that magnitude do not create an exception to the FSIA where Congress has created none. *Princz*, 26 F.3d at 1174; *see also Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242 (2d Cir. 1996) (noting that, although Congress had not done so for Libya's role in the bombing of Pan Am Flight 103, "Congress may choose to remove the defense of sovereign immunity selectively for particular violations of *jus cogens*, as it has recently done in the 1996 amendment of the FSIA"). Although appellants put a new twist on the argument—that *jus cogens* violations can never be authorized by a foreign state and so can never cloak foreign officials in immunity—the same prohibition on creating new exceptions to the FSIA holds. Neither the dissent by Judge Cudahy nor the opinion from the Southern District of New York following *Filartiga*, which a majority of this Court declined to follow in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 820 & 826 n.5 (D.C. Cir. 1984) (Bork, J., concurring) (Robb, J., concurring), *see Al Odah v. United States*, 321 F.3d 1134, 1149 (D.C. Cir. 2003) (Randolph, J., concurring), *rev'd on other grounds*, *Rasul v. Bush*, 542 U.S. 466 (2004), nor any of the cases appellants cite from foreign courts are persuasive or sufficient for this Court to carve another exception into the

FSIA.

We note that the reasoning this Court espoused in *Princz* applies equally well to our holding here:

> We think that something more nearly express is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong. Such an expansive reading of § 1605(a)(1) would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations. In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day—unless disrupted by our courts, that is.

26 F.3d at 1174 n.1. In this case, Plaintiffs do not make allegations against an Idi Amin or a Mao Zedong—they assert that a general in charge of producing intelligence reports for the Israeli Prime Minister committed war crimes and unlawful killings, among other things, because he failed to prevent a military operation that killed civilians in southern Lebanon. These allegations are not sufficient to abrogate the immunity that Congress conferred upon foreign states. We emphasize that our rejection of the purported *jus cogens* exception in no way intends to imply that the alleged inaction by a military officer against whom there are no allegations of personal acts of illegality would fall within such an exception even if we were to recognize the existence of such an exception to the FSIA immunity.

Appellants also argue that General Ya'alon acted outside the scope of his authority, and therefore outside the protection of the FSIA, because he allegedly violated Israeli law. They urge this Court to carve out an exception, quite similar to that for *jus cogens* norms, for foreign officials who violate their state's laws. However, just as the FSIA carves out no exception for complaints that allege violations of *jus cogens* norms, it does not create an exception for alleged violations of a foreign state's laws.

### 3. The Torture Victim Protection Act

Appellants also argue that the FSIA should not bar suit because the TVPA abrogates the FSIA to the extent the FSIA applies to individuals. To support this argument, appellants point to the plain language of the TVPA, which confers civil liability for damages in a wrongful death action on "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing . . . ." 28 U.S.C. § 1350 (note) sec. 2(a). There must be some level of government action for an individual to be liable in a TVPA case, so appellants argue the FSIA will almost always apply to bar suit and effectively nullify the TVPA. In order to resolve the apparent conflict between these statutes, they argue that the TVPA exempts individuals from the FSIA when they are sued in their personal capacities. They claim that the TVPA requires this result because without this exemption, the TVPA would fail to have its full effect.

Appellants' argument fails for several reasons. First, the FSIA does not prevent the application of the TVPA to foreign officials. Even though the TVPA limits actions to individuals acting "under actual or apparent authority, or color of law, of any foreign nation," 28 U.S.C. § 1350 (note) sec. 2(a), it still has

effect when the suit falls under one of the exceptions to the FSIA, *see* 28 U.S.C. § 1605 (listing at least eight exceptions to foreign sovereign immunity, *e.g.*, waiver, commercial activity, and state sponsors of terrorism).

Second, the cases appellants cite from our sister circuits do not support the proposition that the TVPA creates an exception to the FSIA.  Instead, those that even discuss the FSIA at all held that the defendant was acting outside the scope of his authority and therefore not subject to the FSIA.  For example, in *Hilao*, the U.S. Court of Appeals for the Ninth Circuit held that the FSIA did not bar suit against a former Philippine president because he acted outside the scope of his authority, which was "evidenced by the Philippine government's agreement that the suit against Marcos proceed."  25 F.3d at 1472.  Again, in *Trajano v. Marcos*, 978 F.2d 493 (9th Cir. 1992), the FSIA did not bar plaintiff's wrongful death action against a former Philippine official because the defendant's default showed that she "admitted acting on her own authority, not on the authority of the Republic of the Philippines."  *Id.* at 498; *see also Qi*, 349 F. Supp. 2d at 1287 ("Where, as here, the PRC appears to have covertly authorized but publicly disclaimed the alleged human rights violations caused or permitted by Defendants Liu and Xia and asserts that such violations are in fact prohibited by Chinese law, Defendants cannot claim to have acted under [] a valid grant of authority for purposes of the FSIA."); *Xuncax v. Gramajo*, 886 F. Supp. 162, 175–76 & n.10 (D. Mass. 1995) (holding that the FSIA does not provide immunity to the defendant because he acted outside his scope of authority and noting that "[t]here is no suggestion that either the past or present governments of Guatemala characterizes the actions alleged here as 'officially' authorized").  These cases are fully in line with this Court's precedent that the FSIA does not apply to foreign officials acting outside the scope of their authority.  The other cases cited by appellants do not discuss the FSIA at all

and are irrelevant to the issue at hand.

Further, there is no indication in either the language or the legislative history of the TVPA that Congress intended to create another exception to the FSIA; in fact, the language points to the contrary result. When Congress enacted the FSIA, it stated clearly that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in" the FSIA. 28 U.S.C. § 1602; *see Amerada Hess*, 488 U.S. at 437–38 (quoting this language and noting that Congress "very likely [] thought that should be sufficient" to show that the FSIA applies to the ATCA). If Congress had intended to create an exception to the FSIA, it could have done so, as evidenced by its 1996 amendment to the FSIA to exclude state sponsors of terrorism. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, § 221(a)(1) (codified at 28 U.S.C. § 1605(a)(7)). When Congress passed the TVPA in 1991, it did not amend the FSIA and instead appended it to the ATCA, a statute the Supreme Court held in *Amerada Hess* to be subject to all provisions in the FSIA. 488 U.S. at 438.

Finally, the legislative history of the TVPA comports with this Court's interpretation. Both the House and Senate reports on the passage of the TVPA state explicitly that the TVPA is not meant to override the FSIA. *See* H.R. Rep. No. 102-367, at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 88 ("The TVPA is subject to restrictions in the Foreign Sovereign Immunities Act (FSIA) of 1976."); S. Rep. No. 102-249, at 7 (1991) ("[T]he TVPA is not meant to override the Foreign Sovereign Immunities Act of 1976."). In sum, the TVPA, like the ATCA, is subject to all the provisions of the FSIA. *Cf. Amerada Hess*, 488 U.S. at 438.

4. The "No Relief Against the Sovereign" Argument

Appellants finally argue that the FSIA should not bar suit because it does not apply when the complaint seeks no relief against the sovereign. We will not dwell on the merits of this dubious argument because appellants failed to raise it in the court below. Absent exceptional circumstances, a party cannot raise legal issues on appeal that it failed to raise in the district court. *Nemariam*, 491 F.3d at 483.

C. *Jurisdictional Discovery*

Last, appellants claim that they were entitled to jurisdictional discovery. They seek discovery on whether Israel lawfully authorized the defendant to act. Such discovery would seek to disprove Israel's statement that the acts alleged were a "military action[] undertaken by the State of Israel in defending against terrorism" and a "sovereign action[] of the State of Israel, approved by the government of Israel in defense of its citizens against terrorist attacks." Letter from Daniel Ayalon, Ambassador to the United States, State of Israel, to Nicholas Burns, Under Secretary for Political Affairs, State Department (Feb. 6, 2006). Although the "Federal Rules of Civil Procedure generally provide for liberal discovery to establish jurisdictional facts . . . [,] the scope of discovery lies within the district court's discretion." *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994). It follows that the standard of review on this question is abuse of that discretion. *See Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005). As this Court found in *El-Fadl*, "in light of the evidence that [defendant] proffered to the district court and the absence of any showing by [plaintiff] that [defendant] was not acting in his official capacity, discovery would frustrate the significance and benefit of entitlement to immunity from suit." *El-Fadl*, 75 F.3d at 671 (internal quotations omitted); *see also Mwani*, 417 F.3d at 17 (quoting

19

*Goodman Holdings*, 26 F.3d at 1147) (affirming the district court's denial of jurisdictional discovery when the court did "'not see what facts additional discovery could produce that would affect [its] jurisdictional analysis'"). The district court was well within its discretion to deny jurisdictional discovery.

CONCLUSION

Because appellants offer no reason to upset the district court's judgment, we affirm the district court's denial of appellant's motion for jurisdictional discovery and its dismissal of this case for lack of subject matter jurisdiction under the FSIA.

WILLIAMS, *Senior Circuit Judge*, concurring: I join my colleagues in affirming the dismissal of plaintiffs' claim, holding that former Israeli General Moshe Ya'alon is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). In the events giving rise to this suit, he acted in his official capacity as an "agency or instrumentality" of the State of Israel within the meaning of 28 U.S.C. § 1603(b)(2). I write separately only to indicate the different paths taken to arrive at this destination.

1. *Former Officials and* Dole Food. Plaintiffs argue that General Ya'alon is not entitled to foreign sovereign immunity because his military service is over, and § 1603(b)(2)'s first clause defines an "agency or instrumentality of a foreign state" to include an entity that "*is* an organ of a foreign state or political subdivision thereof" (emphasis added). Plaintiffs' failure to raise the argument before the district court provides ample ground for rejection, and I join the court on that point. See Maj. Op. at 8-9. I also agree with the majority—though for slightly different reasons—that if plaintiffs had properly raised the issue, it is unlikely we would have been convinced.

In *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), the Supreme Court addressed § 1603(b)(2)'s second clause, which includes as agencies or instrumentalities of a foreign state those entities "a majority of whose shares or other ownership interest is owned by a foreign state." The Court held that a corporation must be directly owned by the foreign state itself, and owned at the time of suit, for the clause to apply. *Id.* at 477-78, 480; see also Maj. Op. at 10. An official's status as an agency or instrumentality of a foreign state turns on a different clause of § 1603(b)(2): not the "is owned" language, but a separate passage providing agency-or-instrumentality status for an entity that "is an organ of a foreign state or political subdivision thereof." *Id.* Plaintiffs argue that if "is owned" means owned at the time of suit, then an individual

must, to receive immunity under § 1603(b)(2), be an active official at the time of suit.

I join the majority in rejecting this argument, see Maj. Op. at 9-11, but I rest the conclusion not on the differences between corporations and human officials but on the differences between § 1603(b)(2)'s two clauses. Under the majority-ownership prong, a corporation's immunity from suit depends solely on the foreign state's direct ownership of a majority of the corporation's shares; no closer relationship between the foreign state and the corporation is required. *Dole Food* holds that when that relationship is extinguished (even by the foreign state's ownership dropping to fractionally less than a majority of shares), so too is the corporation's claim to sovereign immunity. 538 U.S. at 478-80. The agency relationship is quite different, however, when the individual or other entity has served as an organ of the foreign state; in such a case a finding of immunity will rest on the foreign state's exercise of some degree of control and direction of the person's or entity's activities. Indeed, several decisions (before and after *Dole Food*) have found that corporations can qualify as "organs" of a foreign state under the first clause of § 1603(b)(2) independent of whether they meet *Dole Food*'s direct ownership requirement, see *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206-16 (3d Cir. 2003); *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 639-42 (9th Cir. 2003); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-49 (5th Cir. 2000), as did a recent separate opinion of Justice Breyer, see *Powerex Corp. v. Reliant Energy Servs.*, 127 S. Ct. 2411, 2424-26 (2007) (Breyer, J., dissenting).

This difference in the basic predicates of immunity under the two clauses entails quite different consequences for a change in the entity's status over time. The only logically necessary impact on a foreign state of our exercising

jurisdiction over a corporation it merely owned in the past is at best attenuated: the foreign state may receive a lower sales price for its majority stake if it cannot pass corporate immunity for past deeds along with ownership. But an individual's or other entity's lack of immunity for actions undertaken on the state's behalf would have a significant impact on the foreign state and the United States' relations with that state, particularly where (as here) the foreign state acknowledges its awareness and authorization of those acts. See Letter from Daniel Ayalon, Ambassador to the United States, State of Israel, to Nicholas Burns, Under Secretary for Political Affairs, State Department (Feb. 6, 2006) ("Ambassador's Letter"). After all, foreign sovereign immunity is intended to be "a gesture of comity between the United States and other sovereigns." *Dole Food*, 538 U.S. at 479.

Thus, while we need not decide the issue, it strikes me as implausible that an official automatically ceases to qualify as "an organ of the foreign state" for the purposes of foreign sovereign immunity the minute he leaves his government post.

2. *Alleged Violations of Jus Cogens and Israeli Law*. Plaintiffs also argue that General Ya'alon's actions were violations of Israeli law and of *jus cogens* norms (norms so universally accepted that all states are deemed bound by them under international law, see, e.g., *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939-42 (D.C. Cir. 1988), and, plaintiffs contend, disabled from authorizing their violation). According to plaintiffs, this forecloses his claim to have acted as an agency or instrumentality of the State of Israel. The majority takes plaintiffs' arguments to be an assertion that § 1603(b)(2) contains an "unenumerated exception for violations of *jus cogens* norms," Maj. Op. at 13, and "an exception . . . for foreign officials who violate their state's laws," *id.* at 15. The majority has little trouble finding

that we "rejected this precise argument"—in the context of § 1605's waiver provisions—in *Princz v. F.R.G.*, 26 F.3d 1166, 1173 (D.C. Cir. 1994). Because I understand plaintiffs to make somewhat different assertions about the nature of FSIA immunity for individuals, I reject the argument for somewhat different reasons.

In *Princz*, we held that a foreign state does not impliedly waive its sovereign immunity under § 1605(a)(1) by committing violations of *jus cogens*. The suit in that case was against the Federal Republic of Germany, so there was no question that the FSIA entitled it to immunity in the absence of a specific exception, such as that of § 1605(a)(1). Here, however, the question is whether foreign sovereign immunity applies to General Ya'alon in the first place. Under our cases finding an individual to be an "organ" of a foreign state for purposes of § 1603(b)(2), immunity turns on whether Ya'alon acted in his official capacity as an agency or instrumentality of Israel during the events in question. *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996); see also Maj. Op. at 5-6. Plaintiffs' argument that he did not is thus quite distinct from the argument rejected in *Princz*.

I agree with my colleagues, however, that our reasoning in *Princz* cautions against imputing to the FSIA, without "something more nearly express" from Congress, any bright-line rule that would call on us to "assume jurisdiction over the countless human rights cases" that could be brought against ruthless and murderous officials all over the world. See Maj. Op. at 14 (quoting *Princz*, 26 F.3d at 1174 n.1). Plaintiffs' argument, though distinct from that addressed in *Princz*, would have precisely that effect. As the majority notes, no court decision compels any such proposition. *Id.* at 13.

Besides implying a vast extension of our jurisdiction, plaintiffs' argument poses another concrete problem. They assert that their characterization of Ya'alon's conduct as violating *jus cogens* norms and Israeli law establishes an irrebuttable presumption that he acted without official authority. See Belhas Br. at 24 ("FSIA immunity does not encompass claims against individuals for violations of *jus cogens* norms, which can never be within the scope of an official's authority."); *id.* at 32 ("The assault on the United Nations compound and unarmed civilians is clearly contrary to the laws which Israel itself views as binding. As such, Defendant acted outside the scope of his lawful authority and is not immune."). This approach merges the merits of the underlying claim with the issue of immunity: if Ya'alon's actions *were* torture and extrajudicial killing, then they were necessarily unauthorized and he has no claim to immunity; if they *were not* torture and extrajudicial killing, he would enjoy immunity. Thus immunity could be determined only at the moment of resolution on the merits, at which point it would commonly be irrelevant. See *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990) ("[S]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." (citation omitted)).

In any event, we can resolve the present case without reaching a final resolution of the role that claimed violations of *jus cogens* or Israeli law might play in assessing Ya'alon's status as agent of a foreign state. The *conduct* alleged in the complaint, notwithstanding plaintiffs' *characterization* of that conduct, simply does not amount to such a violation. The most substantial allegations against General Ya'alon assert that he "participated in the decision to target the center of the UN compound during the course of the attack," Complaint ¶ 35, and commanded soldiers involved in the Qana attack, *id.* ¶ 52. While plaintiffs characterize this conduct as violating

both international and Israeli law, they point to no case where similar high-level decisions on military tactics and strategy during a modern military operation have been held to constitute torture or extrajudicial killing under international law, see Restatement (Third) of Foreign Relations Law § 702 cmt. g (1987); Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field art. 3(1)(d), Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31, or under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 (note). Thus we need not decide whether a clear violation of *jus cogens* would bar a finding that a defendant acted within the scope of his authority; any inroad that the nature of the conduct alleged here might make against the inference of such authority is amply offset by the letter of the Israeli ambassador confirming the view that General Ya'alon acted within the scope of his authority.

3. *Torture Victim Protection Act*. I agree entirely with the majority that TVPA claims must comply with the FSIA for courts to have jurisdiction over individuals who acted in their official capacity as agencies or instrumentalities of a foreign state. See Maj. Op. at 15-17. I part company with the majority only in that I find the relevant legislative history to be less helpful to our interpretive exercise, and in any event I would invoke somewhat different passages.

First, the majority states that "[w]hen Congress passed the TVPA in 1991, it did not amend the FSIA and instead appended it to the ATCA, a statute the Supreme Court held in *Amerada Hess* to be subject to all provisions in the FSIA." Maj. Op. at 17. Indeed Congress did not amend the FSIA, but a further inference of congressional intent from the placement of the statute within the United States Code is dubious, at least absent some indication—lacking here (see TVPA, Pub. L. 102-256, 106 Stat. 73 (1992))—that Congress itself, rather than simply the Office of Law Revision Counsel, 2 U.S.C.

§§ 285-285g, directed that placement. See *Turner v. Glickman*, 207 F.3d 419, 428-29 (7th Cir. 2000); see generally Tobias A. Dorsey, *Some Reflections on Not Reading the Statutes*, 10 Green Bag 2d 283 (2007).

Second, while the House Report quoted by the majority does indicate that "[t]he TVPA is subject to the restrictions in the [FSIA]," in almost the next breath it states that "sovereign immunity would not generally be an available defense [to a TVPA claim]." H.R. Rep. No. 102-367, at 5 (1991). And the text of the Senate Report excerpted by the majority states more fully that "[t]he legislation uses the term 'individual' to make crystal clear that foreign states or their entities cannot be sued under this bill under any circumstances: only individuals may be sued. Consequently, the TVPA is not meant to override the Foreign Sovereign Immunities Act (FSIA) of 1976." S. Rep. No. 102-249, at 7 (1991). These references suggest that at the time they enacted the TVPA, many members of Congress may not have realized the extent to which the FSIA covered individuals; indeed, at least one of our sister circuits has held that individuals *cannot* be agencies or instrumentalities of a foreign state under § 1603(b)(2). See *Enahoro v. Abubakar*, 408 F.3d 877, 881-82 (7th Cir. 2005).

While I find the overall message of the legislative history to be mixed—and thus ultimately not that helpful—two passages not cited by the majority would seem to buttress our conclusion. The Senate Report quoted by the majority states elsewhere that "the committee does not intend [FSIA, diplomatic, and head-of-state] immunities to provide former officials with a defense to a lawsuit brought under [the TVPA]. To avoid liability by invoking the FSIA, a former official would have to prove an agency relationship to a state, which would require that the state admit some knowledge or authorization of relevant acts." S. Rep. No. 102-249, at 8 (1991) (internal quotation marks omitted). Similarly, Senator

Arlen Specter responded to a question by reiterating that "[i]n order to take advantage of the FSIA, a [TVPA] defendant would have to prove an agency relationship with the foreign state, which would have to admit some knowledge or authorization of the relevant acts." 138 Cong. Rec. S2667-04, S2668 (daily ed. Mar. 3, 1992) (internal quotation marks omitted). Both of these passages are consistent with this circuit's holding that an individual acting in his official capacity can claim immunity as an agency or instrumentality of the foreign state, see *Jungquist*, 115 F.3d at 1027; *El-Fadl*, 75 F.3d at 671, and with our emphasis in this case on the Israeli Ambassador's unequivocal acknowledgement that General Ya'alon acted "in the course of [his] official duties, and in furtherance of official policies of the State of Israel." Ambassador's Letter, at 2.