**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AHMET DOĞAN, individually and on behalf of his deceased son Furkan Doğan; HIKMET DOĞAN, individually and on behalf of her deceased son Furkan Doğan,<br><br>*Plaintiffs-Appellants*,<br><br>v.<br><br>EHUD BARAK,<br><br>*Defendant-Appellee.* | No. 16-56704<br><br>D.C. No. 2:15-cv-08130-ODW-GJS<br><br><br><br>OPINION |

Appeal from the United States District Court
For the Central District of California
Otis D. Wright, II, District Judge, Presiding

Argued and Submitted April 12, 2018
Pasadena, California

Filed August 2, 2019

Before: Carlos T. Bea and Mary H. Murguia, Circuit
Judges, and Stanley Allen Bastian,* District Judge.

Opinion by Judge Bea

---

* The Honorable Stanley A. Bastian, United States District Judge for the Eastern District of Washington, sitting by designation.

## SUMMARY**

### Torture Victim Protection Act / Foreign Official Immunity

The panel affirmed the district court's dismissal, on the basis of foreign official immunity, of a wrongful death action brought under the Torture Victim Protection Act.

Plaintiffs' son was killed by the Israeli Defense Forces while aboard a vessel in the "Gaza Freedom Flotilla," which sailed from Turkey toward the Israeli naval blockade of the Gaza Strip. Plaintiffs sued Ehud Barak, the Israeli Defense Minister at the time of the incident.

The panel held that Barak was entitled to foreign official immunity. The panel declined to decide whether a State Department suggestion of immunity was entitled to absolute deference or substantial weight. The panel concluded that, even if the suggestion of immunity were not accorded absolute deference, Barak would still be entitled to common law immunity because exercising jurisdiction over him in this case would be to enforce a rule of law against the sovereign state of Israel. The panel further held that the TVPA did not abrogate common law foreign official immunity. The panel declined a recognize an exception to foreign official immunity for violations of *jus cogens* norms.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Dan Stormer (argued) and Brian Olney, Hadsell Stormer & Renick LLP, Pasadena, California; Haydee J. Dijkstal, Stoke and White LLP, London, United Kingdom; for Plaintiffs-Appellants.

Jean-Claude Andre (argued), Sidley Austin LLP, Los Angeles, California; Howard J. Stanislawski and Daniel J. Feith, Sidley Austin LLP, Washington, D.C.; Douglas A. Axel and Christopher M. Egleson, Los Angeles, California; for Defendant-Appellee.

Lewis Yelin (argued) and Sharon Swingle, Appellate Staff; Richard C. Visek, Acting Legal Adviser; Civil Division, Washington, D.C.; for Defendant-Appellee.

William J. Aceves, California Western School of Law, San Diego, California, for Amici Curiae International Law Scholars.

Marco B. Simons, Richard L. Herz, and Zamira M. Djabarova, EarthRights International, Washington, D.C., for Amicus Curiae EarthRights International.

Katherine M. Gallagher, Ruhan Nagra, and Maria C. LaHood, Center for Constitutional Rights, New York, New York, for Amici Curiae Rachel Corrie Foundation for Peace and Justice and the Center for Constitutional Rights.

## OPINION

BEA, Circuit Judge:

We must decide whether the parents of a U.S. citizen killed during a military operation conducted by a foreign nation abroad may sue the foreign official responsible for the operation in federal court on different theories of wrongful death claims, under the Torture Victim Protection Act ("TVPA").[1]  Specifically, we must determine whether such a suit may be brought against a foreign official where the official's acts were performed in his official capacity, where the sovereign government has ratified his conduct, and where the U.S. Department of State has asked the judiciary to grant him foreign official immunity.  We hold that such a suit may not be brought against him, and we affirm the district court's grant of immunity and its order dismissing the complaint.

I

A

The facts underlying this case occurred in the broader context of the decades-long Israeli–Palestinian conflict.  Part and parcel of the conflict has been the ongoing struggle for the eastern Mediterranean tract of land known as the Gaza Strip ("Gaza").  In 1967, following an armed conflict known as the Six-Day War, Israeli Defense Forces ("IDF") took control of Gaza.  Eventually, Israel entered into several peace accords with the Palestinian Authority, relinquishing

---

[1] In the proceedings below, Appellants made arguments based on the Alien Tort Claims Act and the Anti-Terrorism Act.  On appeal, they pursue only claims based on the TVPA.

control of Gaza but retaining full control over the territorial waters adjoining it.

Shortly after Israel's withdrawal, Hamas—a group designated by the United States Government as a terrorist organization—came to power in Gaza. With the Palestinian Authority no longer in control, Israeli–Palestinian relations worsened. Israel began experiencing increased attacks by militant groups in Gaza. As a result, Israel imposed a full naval blockade of the Gaza Strip in 2009 to contain the flow of weapons into the area.

On May 31, 2010, a group of six vessels, calling themselves the "Gaza Freedom Flotilla," sailed from Turkey toward the Israeli naval blockade. The group's purported objective was to "draw international public attention to the situation in the Gaza Strip and the effect of the blockade, and to deliver humanitarian assistance and supplies to Gaza." The son of the plaintiffs in this lawsuit, Furkan Doğan ("Furkan"), was aboard one of the vessels in the flotilla: the *Mavi Marmara*.

When the flotilla was still about sixty miles from the blockade, the Israeli navy transmitted several radio messages to the vessels. The messages informed the flotilla that it was entering a restricted area, that humanitarian assistance could be supplied to Gaza by land, and that all legal measures would be taken to prevent the vessels from breaching the naval blockade. In response, the *Mavi Marmara* transmitted a message indicating its intent to sail through the blockade and its belief that Israel could not legally prevent it from doing so. Consequently, IDF decided to board the vessels to prevent them from breaching the blockade.

From a helicopter, IDF soldiers fast-roped down onto the *Mavi Marmara*. According to several reports of the incident,

the first IDF soldiers to board were met with armed resistance. Occupants of the vessel reportedly attacked the soldiers with makeshift weapons, including clubs, knives, axes, and metal poles. Some reports suggest that certain occupants possessed, and may have used, firearms. When a second group of soldiers boarded the ship, they were authorized to use deadly force against the passengers. Nine passengers of the *Mavi Marmara* were killed during the scuffle, one of whom was Furkan. According to the Doğans' complaint, Furkan was filming the operation from the vessel's top-deck when he was shot and killed by the IDF.

Defendant-Appellee, Ehud Barak ("Barak"), was the Israeli Defense Minister at the time of the *Mavi Marmara* incident. He allegedly planned the operation to intercept the flotilla, directed the operation himself, and personally authorized the IDF to board and take over the vessel. Whether Barak also authorized the use of lethal force is unclear from the record. At any rate, because Barak commanded the forces that took Furkan's life, the Doğans allege that he is responsible.

Relations between Turkey and Israel became tense in the wake of the incident, but international responses varied. Some nations issued statements condemning Israel's actions. The United States' response was more equivocal. Whereas both branches of Congress passed resolutions supporting Israel's actions, the President's public statement simply expressed "regret" for the loss of life. President Obama eventually helped persuade Israeli Prime Minister Benjamin Netanyahu to apologize to Turkish President Recep Tayyip Erdoğan, and in June 2016, Secretary of State John Kerry and Vice President Joe Biden reportedly helped broker the deal which formally resolved the Turkey–Israel disagreement. Israel agreed to pay $20 million to a

compensation fund for Turkish families, and Turkey agreed to end all criminal and civil claims against Israel and its military personnel.

B

On October 15, 2015, the Doğans filed this lawsuit in federal court. They asserted eight causes of action, each of which falls under one of three federal statutes: (1) the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"); (2) the Torture Victim Protection Act, 106 Stat. 73, note following 28 U.S.C. § 1350 ("TVPA"); and (3) the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"). The complaint alleges that Furkan's killing constitutes "torture," "terrorism," and/or an "extrajudicial killing" under the relevant federal statutes and international law, and that Barak is personally responsible because of his commanding authority.

In December 2015, Israel asked the U.S. Department of State to file a Suggestion of Immunity ("SOI") on behalf of Barak. On January 20, 2016, Barak moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) based on common law foreign official immunity, the political question doctrine, and the act of state doctrine. The parties fully briefed the motion. After briefing was complete, the United States filed with the district court a Suggestion of Immunity, which concluded that Barak's actions were official government acts that "were authorized by Israel."[2] The parties filed supplemental briefing on the

---

[2] The SOI is a document filed with the district court by the Department of Justice, based on a determination made by the Department of State. In it, the Government explains that "the State of Israel has asked the Department of State to recognize the immunity of Barak," citing to a "Diplomatic Note" sent by the Israeli embassy to the State Department. In the note, the Embassy of Israel "respectfully requests that the United

effect of the SOI. Thereafter, the district court granted Barak's motion to dismiss on the ground that Barak is entitled to foreign official immunity, declining to reach Barak's arguments as to the political question and act of state doctrines.

The district court held that the foreign official immunity doctrine bars this lawsuit for two reasons. First, the district court stated that federal courts generally have deferred to executive branch determinations of foreign official immunity. *See Samantar v. Yousuf*, 560 U.S. 305, 311 (2010). Here, the district court found that the State Department's SOI warranted such deference. Second, even without the executive branch determination, the district court held that its own analysis would have led it to the same conclusion.

Moreover, the court held that no exception to foreign official immunity applies here. First, the Doğans argued that foreign officials are not immune from liability for violations

States Government submit to the court a suggestion of immunity on behalf of Mr. Barak because all of the actions of Mr. Barak at issue in the lawsuit were performed exclusively in his official capacity as Israel's Minister of Defense." The Embassy characterizes the operation conducted by Barak as "authorized military action taken by the State of Israel." Thus, "[a]fter careful consideration of this matter, including a full review of the pleadings and other materials relied upon by Plaintiffs, the Department of State . . . determined that Barak is immune from suit." Based on this determination, and presumably out of respect for Israel's sovereignty and a concern for international comity, the Justice Department filed its SOI with the district court, representing that "[t]he Executive Branch has determined that former Israeli Defense Minister Ehud Barak is immune from this suit."

of *jus cogens* norms.**[3]** Noting that the question whether such an exception exists has not yet been decided by the Ninth Circuit, the district court adopted the Second Circuit's position that there is no *jus cogens* exception to foreign official immunity and rejected the argument on that basis. *See Matar v. Dichter*, 563 F.3d 9, 15 (2d Cir. 2009). Second, the Doğans argued that the TVPA abrogates common law foreign official immunity by providing liability for "torture" and for "extrajudicial killing[s]" perpetrated by "[a]n individual . . . [acting] under actual or apparent authority, or color of law, of any foreign nation." The court rejected this argument as well, holding that Congress did not intend for the TVPA to abrogate foreign official immunity "where the sovereign state officially acknowledges and embraces the official's acts," as Israel has here. Finding that foreign official immunity (and no exception) applies, the district court granted Barak's motion to dismiss.

## C

We review *de novo* the grant of a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Mills v. United States*, 742 F.3d 400, 404 (9th Cir. 2014). Evidentiary rulings, such as the district court's decision to consider extrinsic evidence, are reviewed for an abuse of discretion. *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013). This court

---

**[3]** A *jus cogens* (Latin: law which compels) norm is "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (adopting definition from the Vienna Convention on the Law of Treaties).

reverses only if the exercise of discretion was "both erroneous and prejudicial." *Id.*

## II

As both parties recognize, the doctrine of foreign sovereign immunity—including foreign official immunity—developed as a matter of common law. *See Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116 (1812); *see also Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (reaffirming that foreign official immunity is governed by common law).[4]  The Supreme Court has noted that a two-step procedure is used to resolve a foreign state's claim of common law immunity. *Id.* at 311–12. At the first step, "the diplomatic representative of the sovereign could request a 'suggestion of immunity' from the State Department." *Id.* at 311.  Generally, "[i]f the request [i]s granted, the district court surrender[s] its jurisdiction." *Id.* at 311.  However, "in the absence of recognition of the immunity by the

---

[4] In *Samantar*, a group of Somalis ("Plaintiffs") brought an action against the former Prime Minister of Somalia, Mohamed Samantar. 560 U.S. at 308.  Plaintiffs alleged that Samantar had authorized their torture and, in some cases, the extrajudicial killings of their family members when he was in charge of the military regime that previously governed Somalia. *Id.*  Samantar argued that the Foreign Sovereign Immunities Act of 1976 ("FSIA") supplied him with immunity from suit.  The district court dismissed for lack of jurisdiction under Rule 12(b)(1), holding that the FSIA applied to foreign officials the same as it does foreign states and thus Samantar enjoyed FSIA immunity.  The Fourth Circuit reversed, holding that the term "state" in the FSIA does not extend to state *officials*. *Id.* at 309–10.  The Supreme Court granted certiorari and affirmed, holding that "the FSIA does not govern whether an individual foreign official enjoys immunity from suit." *Id.* at 310 n.3.  However, the Court noted that whether Samantar enjoyed common law foreign official immunity was a different question "to be addressed in the first instance by the District Court on remand." *Id.* at 326.

Department of State," a court moves to the second step, where it has "authority to decide for itself whether all the requisites for such immunity exist[ ]." *Id.* The court grants immunity at step two if it determines that "the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Id.* at 312 (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)).

In *Samantar*, the Supreme Court noted that "the same two-step procedure was typically followed when a foreign official asserted immunity." *Id*. But *Samantar* stands principally for the proposition that the Foreign Sovereign Immunities Act of 1976 does not govern sovereign immunity over individual foreign officials. *Samantar*, 560 U.S. at 308. Emphasizing the narrowness of its holding, the Supreme Court remanded for the district court to consider "in the first instance," "[w]hether petitioner may be entitled to immunity under the common law . . . ." *Id.* at 325–26. On remand, the Fourth Circuit held that the State Department's immunity determination "carrie[d] substantial weight" but was not dispositive. *Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012) (hereinafter "*Yousuf*"). In so holding, the court distinguished between conduct-based immunity that arises from a foreign official's duties, and status-based immunity that arises from a foreign official's status as a head-of-state. *Id*. at 772–73. Regarding the latter, the Fourth Circuit held that a determination from the State Department is likely controlling. But in *Yousuf*, the defendant was not a head-of-state, and therefore the Fourth Circuit engaged in an independent analysis (although giving "substantial weight" to the State Department's suggestion of non-immunity) to determine that the defendant was not entitled to immunity. *Id.* at 777–78.

The Doğans urge us to adopt the Fourth Circuit's approach.  But we need not decide the level of deference owed to the State Department's suggestion of immunity in this case, because even if the suggestion of immunity is afforded "substantial weight" (as opposed to absolute deference), based on the record before us we conclude that Barak would still be entitled to immunity.  Common-law foreign sovereign immunity extends to individual foreign officials for "acts performed in [their] official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state[.]"  Restatement (Second) of Foreign Relations Law § 66(f) (1965).  According to the Complaint, Barak was "instructed by the Prime Minister to conduct" the operations.  The Complaint further alleged that Barak's "power . . . to plan, order, and control the IDF operation and troops as Minister of Defense is set out in Israel's Basic Law[.]"  The Complaint's claims for relief state—several times—that Barak's actions were done under "actual or apparent authority, or color of law, of the Israeli Ministry of Defense and the Government of the State of Israel."  And if the State Department's SOI is not entitled to absolute deference, we would nonetheless give it considerable weight.  We conclude that exercising jurisdiction over Barak in this case would be to enforce a rule of law against the sovereign state of Israel, and that Barak would therefore be entitled to common-law foreign sovereign immunity even under the Doğans' preferred standard (i.e., conducting an independent judicial determination of entitlement to immunity).

## III

Next, the Doğans argue that even if Barak is entitled to common law immunity, Congress has abrogated common

law foreign official immunity via the TVPA.  The TVPA provides:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350, note § 2(a).  The Doğans contend that the TVPA's plain language unambiguously imposes liability on any foreign official who engages in extrajudicial killings.**5** Thus, the question is whether Barak's common law immunity is abrogated by the text of the TVPA.

The Supreme Court has held that courts should "proceed on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so." *Filarsky v. Delia*, 566 U.S. 377, 389 (2012) (alteration incorporated) (*quoting Pulliam v. Allen*, 466 U.S. 522, 529 (1984)).  Thus, even where "the statute on its face

---

**5** Because we hold that the TVPA does not abrogate common law foreign official immunity, we do not reach the question whether the killing in this case was "extrajudicial" within the meaning of the TVPA.

admits of no immunities," the Court will read it "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Malley v. Briggs*, 475 U.S. 335, 339 (1986) (*quoting Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). Here, although the TVPA purports to impose liability on any "individual who, under actual or apparent authority, or color of law, of any foreign nation" engages in torture or an extrajudicial killing, the statute itself does not expressly abrogate any common law immunities.

Our statutory analysis is also guided by the examination of "the language of related or similar statutes." *City & Cty. of S.F. v. United States Dep't of Transp.*, 796 F.3d 993, 998 (9th Cir. 2015). Here, the most helpful analogue in determining whether the TVPA abrogates common law immunities is 42 U.S.C. § 1983. The Doğans agree that "Section 1983 jurisprudence is highly relevant to the Court's analysis of the TVPA." Section 1983, much like the TVPA, imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives another of a constitutional right. Even with this all-encompassing language ("[e]very person"), the Supreme Court has held that, in passing § 1983, Congress did not "abolish wholesale all common-law immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). Indeed, the Court in *Pierson* held that, even though the word "person" includes legislators and judges, for example, § 1983 did not abrogate common law legislative or judicial immunity. *Id.* at 554–55. It follows that, to the extent this court relies on § 1983 jurisprudence in analyzing the TVPA, the statute's use of the overinclusive term "individual" does not abrogate the immunity given to foreign officials at common law simply because foreign officials fit within the category "individual."

Given that (1) the TVPA is silent as to whether any common law immunities are abrogated and (2) the term "individual" does not imply abrogation of common law immunities for *all* individuals, we "assum[e] that common-law principles of . . . immunity were incorporated" into the TVPA. *Filarsky*, 566 U.S. at 389.

Other considerations counsel against construing the TVPA to abrogate common law foreign official immunity. As the district court observed, "[i]f immunity did not extend to officials whose governments acknowledge that their acts were officially authorized, it would open a Pandora's box of liability for foreign military officials." Indeed, "any military operation that results in injury or death could be characterized at the pleading stage as torture or an extra-judicial killing." And the TVPA allows suits not only by U.S. citizens but by "any person." Because the whole point of immunity is to enjoy "an immunity from *suit* rather than a mere defense to *liability*," the Doğans' reading of the TVPA would effectively extinguish the common law doctrine of foreign official immunity. *Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Court*, 859 F.2d 1354, 1358 (9th Cir. 1988) (per curiam) (emphasis added). Under the Doğans' reading, the TVPA would allow foreign officials to be haled into U.S. courts by "any person" with a family member who had been killed abroad in the course of a military operation conducted by a foreign power. The Judiciary, as a result, would be faced with resolving any number of sensitive foreign policy questions which might arise in the context of such lawsuits. It simply cannot be that Congress intended the TVPA to open the door to that sort of litigation.

Nor does Barak's reading of the TVPA render the statute a nullity, as the Doğans contend. The parties agree that

Congress expected foreign states would generally disavow conduct that violates the TVPA because no state officially condones such actions. Thus, in the great majority of cases, an official sued under the TVPA would never receive common-law immunity in the first place, thereby making abrogation unnecessary. Barak points to two examples of this, which adequately prove the point. First, in *Hilao v. Marcos*, 25 F.3d 1467 (9th Cir. 1994), plaintiffs brought claims against the estate of former Filipino dictator Ferdinand Marcos, based on allegations of torture and extrajudicial killings. The Filipino government expressly denied that Marcos's conduct had been performed in an official capacity and urged that the lawsuits be allowed to proceed. *Id.* at 1472. Likewise, in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), plaintiffs brought an action against a former Paraguayan police official based on allegations that he was responsible for the death of their son. In discussing the act of state doctrine, the Second Circuit noted that the defendant's conduct had been "wholly unratified by [the Paraguayan] government." In cases like *Hilao* and *Filartiga*, the TVPA would operate to impose liability on foreign officials who engaged in torture or extrajudicial killings. Thus, our holding today does not render the TVPA a nullity.**[6]**

For the foregoing reasons, we hold that the TVPA does not abrogate foreign official immunity.

---

**[6]** These cases illustrate circumstances in which a sovereign disavows the conduct of its official. However, both cases mentioned here were filed prior to the TVPA's enactment and thus were not brought under the TVPA. They nevertheless demonstrate an important point: The TVPA need not abrogate foreign official immunity to have effect.

IV

The Doğans next urge this court to hold that foreign officials are not immune from suit for violations of *jus cogens* norms. Under the circumstances of this case, we decline to recognize this exception to foreign official immunity.

At least three circuits have considered whether to create an exception to foreign official immunity for *jus cogens* violations.[7] The Doğans urge this court to follow the approach taken by the Fourth Circuit in *Yousuf* (post-remand from the Supreme Court). 699 F.3d at 777. After the Supreme Court denied Samantar immunity under the FSIA and remanded for consideration of foreign official immunity at common law, the Fourth Circuit held that "officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Id.* at 777. The court explained that *jus cogens* violations should be excepted from the doctrine of foreign official immunity because they are, "by definition, acts that are not officially authorized by the Sovereign." *Id.* at 776.

---

[7] The Doğans argue that this court's precedent requires us to recognize an exception for *jus cogens* violations. But this is a misreading of the court's case law. The cases relied upon by the Doğans for this proposition involve Ferdinand Marcos, a Filipino dictator whose actions were repeatedly disavowed by his own government. *See Marcos*, 25 F.3d at 1472; *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493 (9th Cir. 1992). In those cases, Marcos was not entitled to immunity because the Philippines did not ratify his conduct, and thus the court did not have occasion to consider whether to create an *exception* to foreign official immunity for *jus cogens* violations. No exception was necessary because Marcos never received immunity in the first place.

In examining this same question below, the district court found the Second Circuit's opinion in *Matar v. Dichter* more persuasive.  563 F.3d 9 (2d Cir. 2009).  In *Matar*, plaintiffs sued the former head of the Israeli Security Agency for his role in an Israel-sanctioned bombing which killed the leader of a terrorist group, but which also incidentally killed the plaintiffs' family members.  *Id.* at 10–11.  The Israeli official, Avraham Dichter, argued that he enjoyed foreign official immunity.  Because *Matar* was decided pre-*Samantar*, the Second Circuit analyzed immunity alternatively under both the FSIA and the common law.  The court reiterated that "there is no general *jus cogens* exception to FSIA immunity."  *Id.* at 14.  And, relying on the State Department's statement of interest in favor of immunity, the court held that Dichter was entitled to common law foreign official immunity.  *Id.* at 15 ("The Executive Branch's determination that a foreign [head-of-state] should be immune from suit even where the [head-of-state] is accused of acts that violate *jus cogens* norms is established by a suggestion of immunity.") (*quoting Ye v. Zemin*, 383 F.3d 620, 627 (7th Cir. 2004)).

The Doğans frame their argument as a request that this court adopt the Fourth Circuit's view.  But they actually ask this court to go one step further than the Fourth Circuit went in *Yousuf*.  In *Yousuf*, the State Department had filed a "suggestion of non-immunity," highlighting the facts that (1) the defendant was "a former official of a state with no currently recognized government to request immunity on his behalf" and (2) he was a U.S. legal permanent resident, enjoying "the protections of U.S. law," and thus "should be subject to the jurisdiction of the courts."  *Yousuf*, 699 F.3d at 777.  Although the court ultimately held that foreign officials are not immune for *jus cogens* violations, it did not have occasion to consider whether that should be the case

where the foreign sovereign has ratified the defendant's conduct and the State Department files a Suggestion of Immunity on his behalf. *Id.* at 776 ("However, as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign.") (*citing Siderman*, 965 F.2d at 718). Thus, the court in *Yousuf* had no occasion to consider whether *jus cogens* violations should be an *exception* to foreign official immunity because, as in the *Marcos* cases, the defendant was never given immunity in the first place. As far as we can tell, no court has ever carved out an exception to foreign official immunity under the circumstances presented here. We also decline to do so.

V

Finally, the Doğans argue that the district court abused its discretion when it used extrinsic evidence in describing the *Mavi Marmara* incident and some of the related foreign policy considerations. The court mentioned extrinsic evidence in describing the background facts of the case. However, its decision was based on the facts alleged in the complaint and declarations filed. That is: (1) the conduct challenged was taken by Barak in his official capacity as Israeli defense minister, (2) the state of Israel subsequently ratified Barak's conduct, and (3) the State Department filed a Suggestion of Immunity asking that he be immune from suit. These three facts are undisputed, and they form the basis of the court's legal analysis and decision. Any use of extrinsic evidence was not prejudicial.

VI

For the foregoing reasons, we **AFFIRM** the district court judgment dismissing the Doğans' suit on the ground that Barak is entitled to common law foreign official immunity.