# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 29, 2025

Lyle W. Cayce
Clerk

No. 24-20075

Jane Does 1-5,

*Plaintiff—Appellant*,

*versus*

Willie Obiano,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-813

Before Haynes, Duncan, and Wilson, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Plaintiffs sued a former Nigerian governor under the Torture Victim Protection Act of 1991 ("TVPA"), claiming he ordered military forces to shoot and kill their husbands at rallies in Nigeria. The district court dismissed the suit based on the common-law principle of foreign official immunity. On appeal, the only argument plaintiffs properly present is that the TVPA implicitly abrogates that immunity. We reject that argument and affirm.

No. 24-20075

## I

The complaint alleges Nigerian military forces shot indiscriminately at participants in two peaceful rallies in Nnewi, Anambra State, Nigeria, on August 9, 2020, and October 23, 2020. The widows of five men killed during the rallies ("Plaintiffs") sued the former Governor of Anambra State, Willie Obiano, in a Texas federal court seeking compensatory and punitive damages under the TVPA. The TVPA provides a civil action for victims of torture or extrajudicial killings perpetrated by persons acting under a foreign nation's authority.[1]

Obiano, who now lives in Texas, served as Governor of Anambra from March 17, 2014, to March 17, 2022. The complaint alleges the "extrajudicial killings" of Plaintiffs' husbands occurred "under color of Nigerian law by Nigerian military forces under [Obiano's] command and control."

---

[1] Section 2 of the TVPA provides in relevant part:

(a) Liability. An individual who, under actual or apparent authority, or color of law, of any foreign nation—

   (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

   (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Pub. L. No. 102–256, § 2(a), 106 Stat. 73 (Mar. 12, 1992) (codified as a note to 28 U.S.C. § 1350).

Section 3 defines "extrajudicial killing" as:

a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

*Id.* § 3(a).

No. 24-20075

Obiano moved to dismiss on various grounds, including lack of subject matter jurisdiction based on foreign official immunity. Agreeing with the magistrate judge's recommendation, the district court granted Obiano's motion on that basis.

Plaintiffs timely appealed.

II

We review *de novo* a dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021) (citation omitted).

III

On appeal, the parties dispute whether the district court correctly ruled that Obiano is protected by foreign official immunity. Before addressing that issue, we briefly provide some background on the subject.

A

The question whether foreign states and officials are suable in American courts arose early in our history, typically in connection with suits against foreign vessels. *See* William S. Dodge & Chimène I. Keitner, *A Roadmap for Foreign Official Immunity Cases in U.S. Courts*, 90 Fordham L. Rev. 677, 683–92 (2021) [Dodge & Keitner][2]; *see generally The Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812). The issue implicated not only law but foreign policy and diplomacy. Dodge & Keitner at 683–84.

---

[2] For other commentary on foreign official immunity, *see* Curtis A. Bradley & Laurence R. Helfer, *International Law and U.S. Common Law of Foreign Official Immunity*, 2010 Sup. Ct. Rev. 213, 216-229 (2010); Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704 (2012); Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 Fordham L. Rev. 2669, 2673–2685 (2011).

So, the State Department began the practice of submitting "suggestions of immunity" in such cases. *Id.* at 684–86.

By the early to mid-20th century, the Supreme Court was treating those suggestions as controlling. *Id.* at 685; Curtis A. Bradley & Jack L. Goldsmith, *Foreign Sovereign Immunity, Individual Officials, and Human Rights Litigation*, 13 GREEN BAG 2D 9, 11 (2009); *see, e.g.*, *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945). In the 1950s, the State Department adopted a more "restrictive" view of immunity than previously. *See Matar v. Dichter*, 563 F.3d 9, 13 (2d Cir. 2009) (citing *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486–87 (1983)); *see also Permanent Mission of India to the United States v. City of New York*, 551 U.S. 193, 199 (2007) (discussing "[t]he Tate Letter announc[ing] the United States' decision to join the majority of other countries by adopting the 'restrictive theory' of sovereign immunity"). This new approach distinguished a foreign sovereign's private activities, for which it had no immunity, from its public acts, for which it did. *See Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004); *Matar*, 563 F.3d at 13.

In 1976, Congress enacted the Foreign State Immunities Act (FSIA), which governs the immunity of "foreign state[s]" in civil suits in state and federal courts. *See Verlinden*, 461 U.S. at 488; *see also* 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–1611. FSIA generally codified the restrictive view of immunity. *See Permanent Mission*, 551 U.S. at 199; *Altmann*, 541 U.S. at 689–90. Courts divided, however, over whether FSIA also governed the immunity of foreign officials. *See* DODGE & KEITNER at 689–90.[3] The Supreme Court settled that in *Samantar v. Yousuf*, 560 U.S. 305 (2010).

---

[3] *Compare Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990); *Belhas v. Ya'alon*, 515 F.3d 1279, 1284 (D.C. Cir. 2008) (both ruling that FSIA governed

No. 24-20075

*Samantar* ruled that FSIA's definition of "foreign state" did not include natural persons and that, consequently, the statute did not govern foreign officials' immunity. *Id.* at 313–19, 325. But the Court suggested that officials could still claim immunity "under the common law." *Id.* at 325. The Court noted the pre-FSIA "two-step procedure" for evaluating common-law immunity claims: (1) if the State Department entered a "suggestion of immunity," the court would recognize that immunity and dismiss the case; and (2) absent such a suggestion, the court would decide immunity for itself, inquiring "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Id.* at 311–12 (quoting *Hoffman*, 324 U.S. at 36). The Court did not settle, however, "the precise scope of an official's immunity at common law." *Id.* at 321. [4]

Under the common law, foreign officials may enjoy either status-based or conduct-based immunity. *See Aljabri v. bin Salman*, 106 F.4th 1157, 1163 (D.C. Cir. 2024) (citing *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019)). Status-based immunity is reserved to sitting heads of state and foreign ministers and confers absolute immunity from suit while in office, regardless of the nature of the alleged act. *Ibid.* By contrast, conduct-based immunity applies to foreign officials only for acts taken in their official capacity, and it continues after they leave office. *Ibid.*

B

In this case, the district court followed these parameters in evaluating Obiano's entitlement to immunity. Because Obiano is not alleged to be a

———

foreign officials' immunity), *with Matar*, 563 F.3d at 14 (addressing foreign official's immunity under common law instead of FSIA).

[4] For instance, the Court left open whether that immunity was governed by the Restatement (Second) of Foreign Relations Law § 66 (1965). *See Samantar*, 560 at 321 n.15.

current head of state or foreign minister, only conduct-based immunity was at issue. The court was guided by Judge Friedrich's opinion in *Doe 1 v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018). That case involved similar allegations of extrajudicial killings against numerous Nigerian officials, including Obiano, albeit during times different from the ones alleged here. *See id.* at 222–25.[5]

Applying the two-step procedure discussed in *Samantar*, the district court concluded that Obiano was protected by conduct-based immunity. At step one, the court noted that Obiano had requested no suggestion of immunity from the State Department.[6] So, the court proceeded to step two and assessed whether the State Department would recognize such immunity under established policy.

The district court's step-two analysis generally followed Judge Friedrich's analysis in *Buratai*, which looked to section 66(f) of the Second Restatement of Foreign Relations.[7] The court noted it was "undisputed"

---

[5] Judge Friedrich ruled that the court lacked personal jurisdiction over the defendant officials and, alternatively, that the officials were entitled to conduct-based immunity. *See id.* at 230, 236. The D.C. Circuit affirmed based on personal jurisdiction without reaching immunity. *See Doe 1 v. Buratai*, 792 F. App'x 6, 10 (D.C. Cir. 2019).

[6] By contrast, the Nigerian official defendants in *Buratai* requested a suggestion of immunity from the State Department in 2017. Although the State Department reported in 2018 that it was "actively deciding what if any action to take on Nigeria's request," the Department ultimately filed no suggestion of immunity. *Buratai*, 318 F. Supp. 3d at 231.

[7] Under that section, conduct-based immunity "is available to 'any public minister, official, or agent of the foreign state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'" *Buratai*, 318 F. Supp. 3d at 230 (quoting Restatement (Second) of Foreign Relations Law of the United States § 66(f) (1965)) (cleaned up). Because all parties assume § 66(f) provides the relevant standard, we do not consider whether another one should apply. *Cf.*, *e.g.*, *Lewis*, 918 F.3d at 148–49 (Randolph, J., concurring) (doubting that § 66(f) sets out the common-law standard for foreign official immunity).

that, at the time of the alleged shootings, Obiano was a Nigerian official and was acting in his official capacity by commanding Nigerian soldiers. The court also ruled that exercising jurisdiction would "effectively enforce a rule of law against Nigeria." *Doe 1*, 318 F. Supp. 3d at 233. That was because, the court explained, plaintiffs did not sue Obiano in his individual capacity and because their complaint "repeatedly connects" Obiano's challenged actions to Nigeria's "government, military, and police function[s]." *Ibid.*

Next, the district court declined plaintiffs' invitation to recognize a so-called *ius cogens* exception to foreign official immunity. *Ius cogens* is an international law concept under which officials forfeit immunity for heinous acts such as genocide, slavery, or torture.[8] In the district court's view, most of the circuits to consider this issue have declined to recognize a *ius cogens* exception.[9]

## C

Plaintiffs' appellate brief serves up a dog's breakfast of murky and unsupported arguments. All but one is forfeited for inadequate briefing. *See* Fed. R. App. P. 28(a)(5), (a)(8); *see also United States v. Quintanilla*, 114 F.4th 453, 463 (5th Cir. 2024) (exploring "the outer limits of the doctrine of

---

[8] *See, e.g.*, *Belhas*, 515 F.3d at 1286 (discussing *ius cogens*); *see also* Restatement (Third) of Foreign Relations of the United States § 702 cmts. D–I, § 102 cmt. k (1987); Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 332.

[9] *See Doğan v. Barak*, 932 F.3d 888, 895–96 (9th Cir. 2019); *Matar*, 563 F.3d at 14; *Ye v. Zemin*, 383 F.3d 620, 627 (7th Cir. 2004); *see also Buratai*, 318 F. Supp. 3d at 234 (concluding, under D.C. Circuit precedent, "*ius cogens* allegations do not defeat foreign-official immunity under the common law"). *But see Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012) (concluding "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity"). Because plaintiffs forfeited the *ius cogens* issue, *see infra*, we do not decide whether the district court correctly resolved it.

forfeiture"). The only argument we address is plaintiffs' contention that the TVPA implicitly waives foreign official immunity.[10] We agree with the district court that the TVPA does no such thing.

The TVPA covers a field governed previously by the common law, namely, liability for actions taken under color of foreign authority. Accordingly, "we interpret the statute with the presumption that Congress intended to retain the substance of the common law." *Samantar*, 560 U.S. at 322 n.13 (citing *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)).

As noted, foreign state immunity—including the immunity of foreign officials—was part of the common law. *See Samantar*, 560 U.S. at 311, 322–23; *Matar*, 563 F.3d at 14; Keitner, *The Forgotten History of Foreign Official Immunity*, *supra*, at 709 (discussing late 18th-century cases involving foreign official immunity "as part of the general common law"). "[W]here a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply

---

[10] Accordingly, we do not address the thorny question of how *ius cogens* interacts with foreign official immunity and the TVPA. *See, e.g.*, Curtis A. Bradley, *Conflicting Approaches to the U.S. Common Law of Foreign Official Immunity*, 115 Am. J. Int'l Law 1, 8–9 (2021) [Bradley Conflicting Approaches]; Dodge & Keitner at 704; Christopher D. Totten, *The Adjudication of Foreign Official Immunity Determinations in the United States Post-Samantar: A Circuit Split and Its Implications*, 26 Duke J. of Comp. & Int'l Law 517, 517–19 (2016). Plaintiffs do not properly raise that issue for two reasons. First, their opening brief—to the extent it even addresses the issue—does not develop it in any meaningful way, violating Rule 28(a)(8)(A). *See, e.g.*, *United States v. Stalnaker*, 571 F.3d 428, 439 & n.9 (5th Cir. 2009) (issues forfeited because brief "d[id] not fully explain them," "d[id] not cite the record or relevant law," and made conclusory "one-sentence arguments"). Second, and separately, plaintiffs' statement of issues does not mention the issue, in violation of Rule 28(a)(5). *See Quintanilla*, 114 F.4th at 464 ("Where a party fails to list an issue presented in his or her statement of the issues, the issue is forfeited even if he or she raises the issue in the body of the brief."). At most, the statement raises the implicit waiver argument (which we do address) but says nothing about *ius cogens*, which the district court correctly treated as a distinct issue.

except 'when a statutory purpose to the contrary is evident.'" *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (quoting *Isbrandtsen*, 343 U.S. at 783) (other citations omitted). That is especially true with respect to common-law immunities. As the Supreme Court has explained, a statute must give "clear indication that Congress meant to abolish wholesale all common-law immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

The problem for plaintiffs is that the TVPA says nothing about immunity. It speaks about someone's "liability" for engaging in certain acts under the actual or apparent authority of a foreign nation. *See* TVPA, § 2(a)(1) (providing an "individual . . . shall, in a civil action, be liable for damages"). But such language does not "specifically" or "clear[ly] indicat[e]" Congress's design to remove existing common-law immunities. *Pierson*, 386 U.S. at 554–55. To rule otherwise would ignore what the Supreme Court has long held about § 1983—namely, that its similar language ("Every person . . . shall be liable") does not evince an intent to eliminate common-law immunities.[11] Accordingly, we conclude, as has the Ninth Circuit, that the TVPA does not abrogate foreign official immunity. *See Doğan*, 932 F.3d at 896 ("[W]e hold that the TVPA does not abrogate foreign official immunity.").[12]

---

[11] *See, e.g.*, *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) ("Despite the broad terms of § 1983, this Court has long recognized that the statute was not meant to effect a radical departure from ordinary tort law and the common-law immunities applicable in tort suits."); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) (noting § 1983 "has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials"); *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (holding legislative immunities were not erased "by covert inclusion in [§ 1983's] general language").

[12] *See also* Bradley Conflicting Approaches at 16–17 (concluding the TVPA "is best read not to displace the common law of foreign official immunity," because "[t]he text of the TVPA does not mention immunity, and statutes are normally assumed not to displace the common law by implication—a proposition that the Court in *Samantar*

No. 24-20075

Plaintiffs' response is unconvincing. With no elaboration, they argue only that the availability of foreign official immunity "means the [TVPA] was dead on arrival." We disagree. One could have made the same argument with respect to § 1983 and common-law immunities, which have long been recognized by courts without rendering that statute a dead letter. Furthermore, as the Ninth Circuit has explained, a foreign official would not enjoy immunity if his government disavowed his conduct, something "Congress expected foreign states would generally" do. *Doğan*, 932 F.3d at 895; *see also, e.g.*, *Hilao v. Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994) (pre-TVPA suit against former Philippine dictator Ferdinand Marcos allowed to proceed because the Philippine government expressly denied that Marcos's conduct had been performed in an official capacity).[13]

In sum, the district court correctly ruled that the TVPA does not implicitly waive foreign official immunity.

## IV

The district court's judgment is AFFIRMED.

---

itself referenced") (citing *Samantar*, 560 U.S. at 320); *but see Lewis*, 918 F.3d at 150 (Randolph, J., concurring) (suggesting common-law foreign official immunity "must give way" to the TVPA); *id.* at 148 (Srinivasan, J., concurring) (agreeing with Judge Randolph that the TVPA "displaces any common-law, conduct-based immunity that might otherwise apply").

[13] Plaintiffs also cite *Mohammed v. Palestinian Authority*, 566 U.S. 449 (2012), but that decision holds only that the TVPA's term "individual" includes only natural persons and not organizations. *Id.* at 454–56, 461. It does not address immunity.